**LTL ATTORNEYS LLP**
Caleb H. Liang, SBN 261920
Heather F. Auyang, SBN 191776
Kevin B. Kelly, SBN 274145
300 S. Grand Ave., Suite 3950
Los Angeles, CA 90071
Tel: (213) 612-8907
caleb.liang@ltlattorneys.com
heather.auyang@ltlattorneys.com
kevin.kelly@ltlattorneys.com

Attorneys for Plaintiff
SEEL INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| SEEL INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>XCOTTON CO., a California corporation; XCOTTON INSURANCE SERVICES LLC, a California corporation; XIAOMIANHUA DIGITAL TECHNOLOGY (SHANGHAI) CO., LTD., a limited liability company organized under the laws of the People's Republic of China; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO.: 3:26-cv-01359<br><br>COMPLAINT FOR:<br><br>1. TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)<br>2. FALSE DESIGNATION OF ORIGIN, TRADE DRESS INFRINGEMENT, PRODUCT DISPARAGEMENT, TRADE LIBEL, AND UNFAIR COMPETITION (15 U.S.C. § 1125(A) – LANHAM ACT)<br>3. TRADE SECRET MISAPPROPRIATION (DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)<br>4. UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)<br>5. DEFAMATION<br>6. TRADE LIBEL/PRODUCT DISPARAGEMENT<br>7. BREACH OF CONTRACT<br>8. BREACH OF IMPLIED COVENANT OF |

GOOD FAITH & FAIR DEALING

9. INTENTIONAL MISREPRESENTATION
10. NEGLIGENT MISREPRESENTATION
11. FRAUDULENT CONCEALMENT
12. PROMISSORY FRAUD
13. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
14. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Action Filed: February 13, 2026

Trial Date: Not Set

Plaintiff Seel Inc. ("Seel" or "Plaintiff") hereby files this Complaint against Defendants Xcotton Co., Xcotton Insurance Services LLC, Xiaomianhua Digital Technology (Shanghai) Co., Ltd., and Does 1-50 (inclusive) (collectively, the "Defendants"), and avers as follows:

## NATURE OF ACTION

1. This is a case about systematic fraud and brazen theft of a business model painstakingly built over years. Defendants perpetrated an elaborate fraud from their very first contact with Plaintiff Seel Inc. in August 2023.

2. Under the guise of a collaborative distribution partnership to expand Seel's innovative post-purchase service business to Mandarin-speaking merchants, Defendants fraudulently induced Seel to share its most valuable proprietary assets: a confidential pricing model, product framework, customer and merchant lists with account intelligence, real-time financial performance data and key business metrics, and strategic business plans and go-to-market strategies that took Seel years and substantial investment to develop, sophisticated channel partner commission structures, and comprehensive operational documentation representing Seel's accumulated expertise.

3. Defendants never intended to honor this collaborative agreement. Their sole objective from day one was to steal everything Seel had built—to systematically misappropriate Seel's trade secrets and confidential business information so they could launch a competing business for themselves, built entirely on Seel's stolen intellectual property.

4. The speed and completeness of Defendants' theft prove the fraud was premeditated. Within months of fraudulently gaining access to Seel's confidential information, Defendants launched their copycat Xcotton platform—a mirror image of Seel's services, offering identical post-purchase products using Seel's stolen pricing model and operational blueprints.

5. Defendants' theft is particularly egregious because they copied not just business processes but Seel's entire artificial intelligence-enabled service architecture—attempting to replicate in months what took Seel years of pricing development, data collection, and machine learning optimization to build. Without access to Seel's proprietary technology and accumulated data insights, Defendants could never have launched a competing post-purchase service program

capable of operating at sustainable margins.

6. Defendants then systematically diverted Seel's merchant clients to their fraudulently-created platform, using the insider knowledge they had stolen to undercut Seel's deals and capture opportunities that rightfully belonged to Seel.

7. When Seel uncovered the theft in late 2024 and terminated the sham agreement, Defendants escalated their misconduct into an overt campaign of fraud, retaliation, and reputational sabotage. Defendants continued operating their stolen business, falsely held themselves out as a lawful service provider, and hijacked Seel's federally registered "Worry-Free Purchase" and "Worry-Free Delivery" trademarks to confuse merchants and consumers. At the same time, Defendants launched a coordinated defamation campaign designed to undermine Seel's credibility and drive merchants away—sending "anonymous" emails to Seel's merchant partners falsely accusing Seel of illegally selling insurance in mainland China, and seeding materially identical false accusations through Chinese-language digital media channels, including WeChat-based aggregators, news portals, and content-syndication platforms, to manufacture the appearance of widespread regulatory concern. Subsequent investigation identified substantial evidence that Defendants were involved in, authorized, and/or directed both the "anonymous" emails and the coordinated defamatory publications.

8. Throughout this scheme, Defendants have acted with calculated malice, willful disregard for the law, and complete contempt for basic business ethics. They stole years of Seel's investment and innovation, betrayed trust they fraudulently induced, and continue to benefit from the alleged misappropriation in ways that threaten further harm to Seel's business..

9. Seel now seeks to hold Defendants accountable through this action for trade secret misappropriation, trademark infringement, fraud, unfair competition, defamation, and numerous other related violations of federal and state law, and to obtain injunctive relief prohibiting Defendants from continuing to operate a business built entirely on systematic fraud and stolen property.

## PARTIES

10. Plaintiff Seel Inc. is a corporation organized under the laws of Delaware, with its

principal executive offices in San Francisco, California. Seel offers innovative post-purchase services to online merchants and shoppers, as described more fully below.

11. Defendant Xcotton Co. is a California corporation headquartered at 21 Garden Lane, Daly City, California, whose officer Koney Hoi holds the positions of Chief Executive Officer, Chief Financial Officer, and Secretary. At relevant times, Xcotton Co. purported to act as a sales and integration partner for Seel in promoting Seel's products to merchants. In reality, Xcotton Co. was used as the vehicle to misappropriate Seel's proprietary business model, commercial and partnership structures, and confidential pricing information.

12. Defendant Xcotton Insurance Services LLC is a California limited liability company, whose managing members are Koney Hoi and Xuanfeng Chen and which shares the same address for its principal place of business as Xcotton Co. At all relevant times, Xcotton Insurance Services LLC operated as an affiliated entity within the Xcotton enterprise and was used to market, administer, and/or hold itself out as providing post-purchase services that directly compete with Seel's offerings. Xcotton Insurance Services LLC knowingly participated in and benefitted from the misappropriation of Seel's proprietary business model, confidential pricing model, and partner structures.

13. On information and belief, Defendant Xiaomianhua Digital Technology (Shanghai) Co., Ltd. ("Xiaomianhua") is a limited liability company organized under the laws of the People's Republic of China, with its principal place of business in Shanghai, China. Xiaomianhua is a wholly owned subsidiary of Mianmiao Information Technology (Shanghai) Co., Ltd. ("Mianmiao"). According to China's enterprise public information system, Xuanfeng Chen serves as the legal representative of Xiaomianhua, and he also serves as the legal representative, chairman, and general manager of Mianmiao. Koney Hoi is also one of the directors of Mianmiao. At all relevant times, Xiaomianhua operated as a core operating entity within Defendants' coordinated enterprise, including developing, operating, and promoting a competing post-purchase services platform built using Seel's misappropriated confidential information and trade secrets. Xiaomianhua also participated in disseminating false and defamatory statements and filing fabricated regulatory complaints targeting one of Seel's

affiliated entities. Xiaomianhua committed intentional acts expressly aimed at California and the United States as part of the Xcotton enterprise, including by: using misappropriated confidential information obtained from California; targeting merchants that sell into the United States market; disseminating or supporting false and misleading statements intended to cause reputational and economic harm to Seel in California; and participating in fabricated regulatory complaints against one of Seel's affiliated entities intended to disrupt Seel's operations and relationships. Xiaomianhua knew that Seel was headquartered in California and that the brunt of the harm would be felt there. Xiaomianhua acted as an agent, alter ego, and co-conspirator of the California-based Defendants, and its contacts with California are properly imputed to it for purposes of personal jurisdiction. On information and belief, Xuanfeng Chen a/k/a Bruce Chen and/or Koney Hoi at all relevant times controlled, directed, and managed the affairs of Xiaomianhua, just as they did Defendants Xcotton Co. and Xcotton Insurance Services LLC. Chen and/or Hoi used Xiaomianhua interchangeably with the other Entity Defendants to advance the scheme described herein, and Xiaomianhua maintained no meaningful independent existence apart from the broader Xcotton enterprise.

14. On information and belief, Defendants Xcotton Co. and Xcotton Insurance Services LLC act as agents of Defendant Xiaomianhua Digital Technology (Shanghai) Co., Ltd. Defendants Xcotton Co. and Xcotton Insurance Services LLC function as the U.S. operational arm and general manager of Xiaomianhua in California, handling Xiaomianhua's business in the U.S. and acting on its behalf. Xiaomianhua has no separate offices or personnel in the U.S. and instead uses Defendants Xcotton Co. and Xcotton Insurance Services LLC's California office as its own U.S. base of operations.

15. Plaintiff is presently unaware of the true names and capacities of Does 1 through 50 (whether individuals, corporations, or otherwise), inclusive, who were involved in or are responsible for the wrongdoing alleged herein. These Doe Defendants may include additional Xcotton-affiliated entities or persons who aided in the misappropriation of Seel's business model/trade secrets or the dissemination of defamatory statements about Seel. Plaintiff will amend this Complaint to allege the true names and capacities of such defendants when

ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Doe Defendants is responsible in some manner for the acts and omissions described below and that each such Defendant is jointly and severally liable to Seel.

16. On information and belief, at all relevant times, each Defendant was the agent, partner, co-venturer, or representative of the other Defendants, and in doing the acts alleged, was acting within the course and scope of such agency or relationship. All Defendants pursued a common business plan or scheme and actively conspired with, aided, and abetted each other in furtherance of the wrongful conduct alleged herein.

17. On information and belief, Defendants operated as a single, integrated enterprise with no meaningful separation of roles or functions, with Xcotton Co. serving as the primary contracting and outward-facing entity, and the remaining Defendants performing complementary and supporting functions under common ownership and centralized control. Different Defendants performed different components of the same wrongful scheme, including platform development, merchant solicitation, pricing decisions, regulatory targeting, and dissemination of defamatory content, all pursuant to centralized direction and shared objectives. The acts of each Defendant were interdependent and necessary to the overall scheme, and no Defendant acted independently of the enterprise as a whole.

18. On information and belief, there was at all relevant times a unity of interest and ownership among Defendants such that the separate corporate existence of the Xcotton entities did not in fact exist. Xcotton Co. was inadequately capitalized and functioned as a mere shell or instrumentality through which the other Xcotton-affiliated entities and their principals carried out the misconduct alleged herein, including entering into and exploiting the MSA to obtain Seel's confidential information while attempting to insulate themselves from contractual and tort liability. The Xcotton corporate Defendants share common ownership, management, and control; commingle operations and resources; operate with overlapping personnel, systems, and business functions; and disregard corporate formalities. These entities operate as a single, integrated enterprise with no meaningful separation of roles, assets, or decision-making authority, and each act at the direction of and for the benefit of the others. Under these circumstances, adherence to

the fiction of separate corporate existence would sanction fraud and promote injustice. Accordingly, Xcotton Insurance Services LLC and Xiaomianhua Digital Technology (Shanghai) Co., Ltd. are alter egos of Xcotton Co., and all Defendants are jointly and severally liable for the acts alleged herein and for all relief sought.

19. At all relevant times, each Defendant knowingly participated in, directed, authorized, or materially assisted the wrongful conduct alleged herein, exercised overlapping control over the acts giving rise to Plaintiff's claims, and knowingly accepted and retained the benefits of that misconduct, thereby ratifying the conduct even where specific acts were carried out by another Defendant.

20. The specific internal allocation of responsibilities among Defendants is known primarily to Defendants. Accordingly, unless otherwise specified, references to "Defendants" in this Complaint include acts undertaken by one or more Defendants, including through officers, directors, employees, agents, or affiliated entities acting within the scope of their authority and for the benefit of the enterprise.

## JURISDICTION AND VENUE

21. This action arises under federal law, including the Lanham Act (15 U.S.C. §§ 1114 & 1125) and the Defend Trade Secrets Act (18 U.S.C. § 1836). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

22. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Defendants' wrongful conduct was expressly aimed at this District and at Seel's California-based business, including by misappropriating Seel's trade secrets and confidential information obtained from California, targeting and diverting merchants serving United States consumers, disseminating false and misleading statements intended to cause reputational and economic harm to Seel in California, and causing injury to Seel in this District. Venue is also proper under 28 U.S.C. § 1391(c)(3) because Defendant Xiaomianhua Digital

Technology (Shanghai) Co., Ltd. is a foreign defendant that may be sued in any judicial district.

23. Defendants are subject to personal jurisdiction in California. Defendants Xcotton Co. and Xcotton Insurance Services LLC are California entities subject to general jurisdiction in this forum. Defendant Xiaomianhua Digital Technology (Shanghai) Co., Ltd. is subject to specific personal jurisdiction because it committed intentional acts expressly aimed at California and the United States as part of a coordinated enterprise, including developing and supporting a competing platform using misappropriated information obtained from California, targeting merchants serving United States consumers, disseminating or supporting defamatory and misleading statements, and participating in regulatory abuse intended to disrupt Seel's California-based operations. Each Defendant acts as an agent, alter ego, co-conspirator, or participant in a single integrated enterprise, and the forum-directed contacts of each Defendant are properly imputed to the others. The exercise of jurisdiction over each Defendant comports with due process and traditional notions of fair play and substantial justice.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A. Seel's Post-Purchase Services and Proprietary Business Model

24. Seel is an artificial intelligence-driven technology company that operates a comprehensive post-purchase service program for consumers who shop online through independent merchant websites. In essence, when a consumer buys a product from a participating online merchant, Seel provides a premium post-purchase service for a small fee. Through its proprietary risk model and artificial intelligence agents, Seel's post-purchase service program provides live support, real-time tracking, and replacements or refunds for items that do not arrive as described.

25. Seel represents a paradigm shift in e-commerce infrastructure. Rather than selling software tools like traditional software as a service ("SaaS") companies, Seel operates an artificial intelligence-enabled service that delivers the complete post-purchase experience—essentially building a "Prime for everything outside Amazon." The company's proprietary technology stack includes sophisticated algorithms that analyze over 200 pre-purchase signals to predict return probability, artificial intelligence agents trained on over 10 million orders that

automate customer support, and machine learning models continuously optimizing service delivery across thousands of merchants. This technology-first approach enables Seel to transform what merchants traditionally spend 25% of revenue managing into a seamless, scalable service.

26. Seel's competitive advantage rests on years of accumulated proprietary knowledge and technology development. Seel's ability to offer its post-purchase service programs profitably at scale is built on significant proprietary business knowledge, sophisticated artificial intelligence algorithms, and a confidential pricing model that required substantial time, money, and expertise to develop. Over years, Seel has invested millions of dollars to painstakingly develop and refine a sophisticated business model that revolutionizes the post-purchase service industry.

27. A central component of Seel's business model is its proprietary pricing model and confidential data compilations used to drive transaction-level service pricing and automate post-purchase support workflows. Seel's artificial intelligence-powered systems determine the post-purchase service risk and fee charged for a given order based on proprietary analytics regarding observed post-purchase service costs, service-request occurrence frequency, product categories, merchant characteristics, and consumer behavior patterns. This pricing methodology is a closely guarded trade secret that enables Seel to charge optimal fees that are fair to the consumer while maintaining sustainable margins—a balance that cannot be readily ascertained or replicated without access to Seel's confidential data and methodologies.

28. Beyond its core technology, Seel has developed detailed and confidential partner compensation frameworks, strategic commercial arrangements, and performance-based incentive architectures for channel partners and distribution agents. These structures reflect Seel's proprietary understanding of partner motivations and the optimal economic alignment mechanisms required to ensure partner loyalty and performance, including sophisticated, tiered incentive systems designed to maximize sales while maintaining profitability. The specific percentages, tier thresholds, bonus structures, performance milestones, and payment terms in these arrangements are not publicly known and constitute valuable trade secrets derived from Seel's extensive market experience and rigorous testing.

29. Seel further compiled extensive confidential documentation concerning its business operations, including merchant onboarding processes, service workflows, customer service protocols, marketing strategies, merchant pitch materials, integration best practices, and performance metrics. This documentation reflects Seel's accumulated expertise and provides a comprehensive blueprint for operating a successful post-purchase service business, the disclosure or misuse of which would provide an unfair competitive advantage to unauthorized users.

30. All of this confidential business information has independent economic value from not being generally known to competitors or to other persons who could obtain economic value from its disclosure or use. Seel has invested millions of dollars and countless hours in developing these proprietary materials and methods, which provide it a substantial competitive edge in the rapidly evolving market for post-purchase services.

31. Seel markets its post-purchase services under distinctive brand names. Its flagship offerings are called "Worry-Free Purchase" and "Worry-Free Delivery." Through the Worry-Free Purchase and Worry-Free Delivery programs, a shopper receives a simple, universal support, tracking, and refund or replacement experience that is consistent across all their merchant partners.

32. Seel maintains federal trademark registrations for Worry-Free Purchase (Registration No. 7,987,578, which Seel applied for on January 9, 2025 and which was registered on Oct. 14, 2025) and Worry-Free Delivery (Registration No. 8,006,794, which Seel applied for on January 9, 2025 and which was registered on Oct. 28, 2025) (registrations attached as Exhibits A and B hereto).

33. Seel first used the Worry-Free Delivery mark in commerce no later than February 2024, and first used the Worry-Free Purchase mark in commerce no later than July 2024, in connection with its post-purchase services offered to online merchants and consumers throughout the United States. Since those first-use dates, Seel has used each mark continuously and substantially exclusively in commerce in connection with those services.

34. From first use through the present, Seel has prominently displayed the Worry-Free Delivery and Worry-Free Purchase marks at critical consumer and merchant touchpoints,

including at online checkout, in order confirmations, within post-purchase service and customer-support workflows, on merchant onboarding materials, and in marketing and sales presentations to prospective merchants. The marks function as source identifiers, signaling that the post-purchase services are provided by Seel.

35. Through extensive, continuous, and exclusive use, promotion, and commercial success, the Worry-Free Delivery and Worry-Free Purchase marks have acquired secondary meaning in the relevant marketplace. Seel has offered post-purchase services under the marks across hundreds of merchant websites serving consumers in the United States, generating millions of consumer impressions of the marks at checkout and post-purchase over the course of its operations. Seel has derived substantial revenue from services sold under the marks and has devoted significant marketing and promotional expenditures to building recognition of the marks among online merchants and e-commerce platforms. As a result of this extensive use and promotion, merchants and consumers have come to associate the Worry-Free Delivery and Worry-Free Purchase marks exclusively with Seel as the source of those services.

36. As a result of this marketplace recognition, when merchants and consumers encounter the Worry-Free Delivery and Worry-Free Purchase marks in connection with post-purchase services, they understand those marks to identify Seel and no other source.

37. Seel reaches online merchants through a combination of direct sales and channel partners. Rather than merchants integrating Seel's services on their own, Seel often works with distributor partners who help introduce and integrate Seel's post-purchase services and products into merchants' online stores. These partners are given access to certain aspects of Seel's business model and are provided with Seel's documentation, know-how, and marketing materials so that they can effectively sell Seel's services to merchants.

38. However, Seel is highly selective in sharing its proprietary information. It only permits access to such confidential information under strict agreements that prohibit disclosure or unauthorized use. Any partner must contractually agree to maintain Seel's information in confidence and to use Seel's business knowledge solely for the purpose of promoting Seel's products—not to reverse engineer it, copy it, or develop a competing product. In short, Seel

trusts these partners with its proprietary know-how only after securing legal commitments that the information will not be misused.

39. Seel took reasonable measures to maintain the secrecy of its confidential business information and trade secrets. These measures included restricting access to sensitive information on a need-to-know basis; requiring distributors and partners, including Defendants, to execute written agreements containing strict confidentiality, ownership, and use-limitation provisions; limiting dissemination of proprietary materials to controlled channels; and providing access to pricing data, operational documentation, and merchant information only after contractual safeguards were in place. These measures were reasonable under the circumstances and consistent with industry practice.

**B. <u>Defendants' Fraudulent Approach: The Bait-and-Switch Scheme Begins</u>**

40. In late August 2023, Defendants—acting through Xuanfeng Chen a/k/a Bruce Chen, who at all relevant times served as an officer, agent, and controlling person of each of the Entity Defendants—approached Seel with what they falsely characterized as a strategic business collaboration. In reality, Defendants' approach was a pretext for a premeditated scheme to misappropriate Seel's proprietary business model and trade secrets.

41. Chen represented that Defendants were uniquely positioned to help Seel expand its post-purchase services for Mandarin-speaking merchants, a market in which Seel did not then maintain a direct sales presence. Chen falsely claimed that Defendants had extensive established relationships within Mandarin-speaking merchants that would allow them to rapidly onboard such merchants to Seel's platform—capabilities that Seel lacked on its own at that time. Chen further asserted that this purported partnership could generate substantial profits from the Mandarin-speaking merchants, with potential revenue exceeding $100 million, based on Defendants' purported infrastructure and market access necessary to accomplish this expansion.

42. To induce Seel's reliance and secure access to Seel's confidential information, Defendants, through Chen, provided Seel with detailed capability presentations and supporting materials fraudulently portraying Defendants as a legitimate, compliant, and internationally operating business. These materials specifically represented that Defendants maintained active

partnerships with reputable businesses, and had achieved technical integration with major e-commerce platforms. The materials further represented that Defendants currently served recognized merchants through compliant, secure systems for administering post-purchase offerings and merchant facing services, and that Defendants possessed the regulatory authority and operational infrastructure necessary to lawfully offer and support those services.

43. Chen further assured Seel that Defendants sought to represent Seel's products with Seel's best interests in mind, characterizing the proposed relationship as a mutually beneficial, long-term strategic partnership rather than a competitive relationship. He promised that Defendants would be Seel's trusted distribution partner to Mandarin-speaking merchants and that together they would both profit immensely. To further induce Seel's trust, Defendants provided Seel with a capability deck and other materials touting Defendants' network and service capacity. These assurances were designed to allay any concerns Seel might have about disclosing sensitive commercial information to a potential competitor.

44. These representations were specifically designed to induce Seel's reliance. Based on Defendants' detailed representations regarding purported regulatory compliance, claimed third-party relationships, platform integrations, compliance infrastructure, and global operations, Seel reasonably understood Defendants to be a sophisticated, legitimate commercial partner capable of lawfully offering services to Mandarin-speaking merchants and performing as a bona fide distribution partner rather than a competitor. Given Seel's lack of existing coverage of Mandarin-speaking merchants, Seel's leadership recognized the value of partnering with an allegedly reputable market-native business and had no reason to suspect fraud. In direct and justifiable reliance on these material misrepresentations, Seel entered into a formal business relationship and disclosed confidential information—actions Seel would not have taken absent Defendants' false assurances regarding their legitimacy, compliance with applicable laws, and contractual commitment to function as Seel's partner.

45. Unknown to Seel at the time of these representations and disclosures, Defendants' material representations were knowingly false when made. Defendants never possessed any genuine intent to form a legitimate collaborative partnership with Seel. Instead, Defendants

deliberately employed the pretense of partnership as a strategic mechanism to gain access to Seel's confidential business information, trade secrets, and proprietary methodologies, to acquire detailed market intelligence regarding Seel's operations, strategies, and competitive positioning, and to obtain the specific knowledge necessary to replicate Seel's business model and compete directly against Seel.

46. Upon information and belief, Defendants formed the intent to compete directly with Seel and to misappropriate Seel's confidential information for competitive purposes prior to making the fraudulent representations described above. This fraudulent intent existed before any formal business relationship was established and before Seel disclosed any confidential information, demonstrating that Defendants' entire approach constituted a calculated fraud designed from its inception to misappropriate Seel's proprietary assets under false pretenses.

### C. <u>The Fraudulent Collaboration Agreement: Setting the Trap</u>

47. Based on Defendants' misrepresentations, on or about November 1, 2023, Seel and Xcotton Co. executed a written Master Services Agreement ("the Agreement" or "MSA"). The Agreement appointed Xcotton Co. as a distributor of Seel's post-purchase products and services to Mandarin-speaking merchants and outlined each party's obligations.

48. Although only Xcotton Co. was a formal signatory to the MSA, on information and belief, the other Defendants directed, controlled, and substantially participated in performance under the Agreement, exercised decision-making authority with respect to Seel's confidential information, and caused that information to be disseminated and used throughout the enterprise. These Defendants knowingly accepted the benefits of the MSA and assumed its obligations.

49. Under the MSA, Seel provided its proprietary business information as needed for Defendants to market and integrate Seel's products to Mandarin-speaking merchants. Acting in good faith and then believing Defendants to be a legitimate strategic distribution partner, Seel disclosed its most sensitive and valuable proprietary business information, including: detailed pricing and risk-assessment models showing how Seel calculated post-purchase services fees across product categories and transaction-outcome profiles; confidential partnership structures,

including the design of compensation and incentive programs for channel partners; daily service fee volume data and customized internal reports reflecting Seel's core performance metrics; and comprehensive operational and process documentation governing the delivery of Seel's services.

50. In addition, in order to facilitate collaboration between the parties to maximize results and revenue generation, Seel engaged in dozens of detailed strategic calls and working sessions with Defendants' representatives, during which Seel—acting in good faith and believing Defendants to be a committed long-term partner—openly shared its most sensitive competitive intelligence and strategic thinking. During these discussions, Seel disclosed its proprietary customer targeting methodologies, including the specific merchant characteristics, segmentation criteria, and messaging frameworks that Seel had developed through years of expensive trial and error to identify and convert high-value accounts across electronics, apparel, home goods, and appliance categories. Seel further revealed its industry-specific partnership structures and deal economics, walking Defendants through precisely how Seel calibrated pricing, commission rates, and service offerings differently for enterprise versus mid-market versus small and medium-sized merchants, and explaining which structures worked best for each vertical based on Seel's extensive market experience. Seel also provided detailed merchant tier breakdowns identifying which customer segments generated the highest margins and lowest churn, shared competitive intelligence regarding Seel's perceived vulnerabilities and strategic concerns, and disclosed forward-looking expansion plans including which new verticals and geographic markets Seel intended to pursue.

51. Through these extraordinarily candid discussions, Defendants gained a comprehensive, 360-degree view of Seel's business strategy, competitive positioning, target markets, and future plans—intelligence that would have cost any legitimate competitor millions of dollars and years of market experience to develop independently.

52. In exchange for access to Seel's confidential business information, Defendants agreed to critical restrictions and duties in the MSA, including the following:

a. Defendants acknowledged that they would have access to Seel's confidential information, and agreed that all such information "shall remain the sole property"

of Seel. The Agreement imposed a duty on Defendants to maintain the confidentiality of Seel's proprietary information and to "hold in confidence and protect the Confidential Information from dissemination to, and use by, any third party." This obligation included the acknowledgement that the "Documentation shall be deemed Company's Confidential Information hereunder." (Sections 1.7, 8.1, and 8.2(ii) of the MSA.)

b. Defendants agreed to use Seel's confidential information solely for promoting Seel's products to merchants and creating an integrated offering, specifically licensing the Technology "solely for purposes of combining and integrating the Technology of both Parties into a single Integrated Product." The MSA explicitly prohibited Defendants from distributing the Technology "as a stand-alone or unbundled product" and barred Defendants from attempting to "reverse engineer, decompile, disassemble or otherwise attempt to reconstruct or obtain the source code of the other Party's Technology." (Sections 2.1, 3.1, and 3.4 of the MSA.)

c. Defendants promised to conduct its business in a manner that would "reflect favorably on each Party's Technology and good name, goodwill, and reputation." (Section 6.3 of the MSA.)

53. The Agreement made clear that Defendants were being given access to Seel's valuable confidential business information for the limited purpose of furthering their business arrangement—and that Defendants could not lawfully use that access to compete with Seel or steal Seel's business model. Defendants agreed to these terms in bad faith, never intending to honor them.

54. The commercial arrangement was that Seel would pay Defendants a portion of the revenue generated from any merchants that Defendants brought onto Seel's platform through percentage commissions on post-purchase services fees (in addition to certain incentive or promotional fees). As part of the distribution partnership, Defendants directly communicated with merchants, presenting Seel's products, explaining pricing and service terms, and coordinating onboarding and integration. Through this relationship, Defendants received

information regarding Seel's merchant relationships, sales pipeline information, and confidential business strategy.

55. In the initial months after the MSA was signed (late 2023 into early 2024), Defendants maintained the appearance of cooperative efforts to continue the fraud and maintain access to Seel's confidential information. Defendants' personnel (including an employee named Hu Ye under Chen's direction) actively communicated with Seel's team about onboarding merchants, technical details, and sales materials—all the while gathering intelligence about Seel's business for Defendants' own competing enterprise. Defendants also provided feedback from the field, such as reporting on merchant interest and suggesting operational adjustments. Seel accommodated these requests and worked in good faith with Defendants.

56. By mid-2024, Defendants were reporting progress, such as new merchants being integrated and daily revenue targets. In July 2024, Seel extended a special high-rate revenue offer to incentivize Defendants' channel sales. In August 2024, Defendants' team, including Chen personally, was closely tracking Seel's daily sales figures and actively pressuring Seel to expedite merchant onboarding, demonstrating Defendants' deep operational involvement in Seel's business. To facilitate this collaboration and enable accurate commission calculations, Seel provided Defendants with granular, deal-by-deal data for every single merchant Seel onboarded, including the specific product offerings purchased, the exact pricing negotiated, the contract term and renewal structure, the monthly and cumulative revenue generated, and the partner compensation paid to other distribution channels. This extraordinarily detailed customer-level intelligence—which Seel disclosed in good faith to maximize transparency and joint revenue optimization—gave Defendants a complete view of Seel's entire commercial operation, revealing precisely which merchants were most profitable, which pricing strategies were most effective, what competitors were charging, and how much commission other partners were earning. Armed with this competitive roadmap, Defendants possessed all the information necessary to systematically target Seel's highest-value customers with precisely calibrated competing offers designed to undercut Seel's pricing by marginal amounts while offering superior economics to merchants.

57. On information and belief, Defendants were secretly planning to build their own competing business from the very beginning, even while making their initial representations about forming a distribution partnership with Seel. Throughout this period, Defendants perpetuated the sham collaboration by continuing to communicate about progress on the purported partnership, soliciting Seel's trust, and gaining access to its proprietary systems, all while concealing their true competitive intentions. Had Defendants disclosed their intent to become a competitor, Seel would never have shared its confidential information or signed the Agreement.

### D. The Theft: Defendants Fraudulently Obtain and Misappropriate Seel's Business Model

58. By mid to late 2024, armed with Seel's confidential information obtained through their fraudulent misrepresentations, Defendants had surreptitiously built and launched their own competing platform—the "Xcotton" platform—offering post-purchase services that were functionally and commercially identical to Seel's services. The speed with which Defendants launched their copycat operation—within months of gaining access to Seel's confidential information—demonstrates that this was not independent development but outright misappropriation. Defendants' theft was comprehensive, deliberate, and systematic.

59. Defendants' theft of Seel's business model was so obvious and brazen that independent third parties in the e-commerce industry immediately recognized what had occurred. In a March 17, 2025 WeChat conversation between employees of a major e-commerce platform provider with no connection to this dispute, the participants discussed Xiaomianhua's offering. One employee asked about the nature of Xiaomianhua's product, and the other employee responded: "Same as Seel" and "Xiaomianhua was originally Seel's agent/distributor." When asked to clarify, the employee explained: "Now they're not doing distribution anymore, they went off on their own and made a similar one." This candid acknowledgment by uninvolved third parties, made in a private conversation between industry participants, confirms multiple critical facts: (a) Defendants' role as Seel's distribution partner was known in the industry; (b) Defendants abandoned that role to create their own competing service; (c) the competing service

was recognized as “similar” to Seel’s; and (d) independent observers could immediately understand that Defendants had taken what they learned as Seel’s distributor and used it to build their own copycat business. The fact that industry participants could so readily recognize Defendants’ misconduct demonstrates both the obviousness of the theft and the extent of damage to Seel’s reputation and competitive position in the merchant services community.

60. Defendants misappropriated Seel’s proprietary pricing model and applied them directly to Defendants’ copycat business. By using Seel’s pricing logic, Defendants were able to instantly match Seel’s pricing competitiveness without investing in the years of data analysis, testing, and refinement required to develop such models independently.

61. Defendants also misappropriated Seel’s confidential channel-partner compensation structures, using these proprietary compensation models to recruit and incentivize their own channel partners with sophisticated, tiered commission programs they had not developed themselves.

62. Defendants further replicated Seel’s operational workflows, including merchant onboarding processes, consumer service procedures, and customer-service protocols, copying Seel’s marketing and customer-facing content verbatim. At times, Defendants left Seel’s name embedded in text displayed on their affiliated websites—clear evidence of direct copying.

63. Defendants further weaponized Seel’s confidential information and trade secrets to interfere with Seel’s business relationships. Seel had existing contractual relationships with multiple merchants governing the offering of Seel’s post-purchase services, including agreements requiring merchants to route covered transactions through Seel for the duration of the contract term. Seel also maintained a pipeline of prospective merchant relationships that were in active negotiations or late-stage integration discussions with a reasonable probability of resulting in future economic benefit to Seel. Defendants were aware of these relationships through their access to Seel’s confidential merchant data and business development materials.

64. As part of their fraudulent scheme, Defendants not only built a parallel service but also actively began migrating business away from Seel to their own platform. On information and belief, Defendants’ salespeople and agents—who had relationships with merchants through

the Seel distribution partnership—secretly switched those merchants over to Defendants' clone service without Seel's knowledge or consent. Defendants possessed insider knowledge regarding which merchants were working with Seel, the specifics of Seel's pricing and terms for those merchants, and Seel's confidential commission structures—all stolen information that enabled Defendants to undercut or exactly match Seel's deals. Defendants successfully moved many merchants off Seel's platform in late 2024, resulting in substantial loss of business.

65. Although Defendants misrepresented their intent to target only the Mandarin-speaking merchants, Defendants' plan was always global. By stealing Seel's model wholesale, Defendants positioned themselves to compete with Seel throughout the world. Contrary to their fraudulent assurances that they would help Seel reach Mandarin-speaking merchants, Defendants used Seel's stolen business information with the aim of displacing Seel in other markets.

66. Throughout 2023 and much of 2024, Defendants expertly concealed their duplicity through continuous misrepresentations and omissions. Defendants continued to communicate with Seel as if everything were routine, even as they launched their parallel enterprise. Defendants never disclosed their development of a competing product, never sought permission to use Seel's confidential business information, and never admitted to switching merchants to their platform.

**E. <u>Discovery of the Fraud and Theft</u>**

67. In or about November 2024, Seel's team observed suspicious activity indicating that Defendants might be running a competing service. Upon investigation, Seel discovered that Defendants were indeed offering a competing post-purchase service program virtually identical to Seel's—built using Seel's stolen confidential information and trade secrets. Shocked by this apparent betrayal, Seel's representatives immediately confronted Defendant Chen in a phone call and an in-person meeting.

68. When questioned, Chen admitted that Defendants had launched their own service but attempted to justify it through further misrepresentations. Chen falsely claimed that Defendants' service was only deployed for certain European merchants or other regions where Seel was not active, supposedly to fulfill a particular merchant's request for services that Seel's

United States program does not offer. Chen assured Seel that Defendants were not targeting Seel's core markets or existing clients.

69. In order to confirm whether Chen was being truthful, Seel placed two test orders purchasing Defendants' post-purchase services as United States consumers—proving that, contrary to Chen's assertions, Defendants' service was readily accessible to United States customers in Seel's own territory. (Exhibits C and D.)

70. When confronted with this evidence, Chen repeated his false claims about geographic limitations and client demands. But, in truth, Defendants had rolled out a full competing service using Seel's stolen business model without any geographic limitations. Defendants intended to (and did) compete with Seel globally.

71. At that point, it became clear to Seel that Chen had been lying throughout the relationship, that the distribution partnership had been a fraud from the beginning, and that Defendants had systematically stolen Seel's business.

72. Having uncovered Defendants' egregious misconduct, Seel moved to sever ties. On or about December 31, 2024, Seel sent formal notice that it was terminating the MSA due to Defendants' material breach and the fact that Defendants had become a direct competitor.

73. After termination of the MSA, Defendants failed to cease use of Seel's confidential information and did not return or destroy Seel's proprietary materials as required by the Agreement. Instead, Defendants continued using Seel's pricing model, operational workflows, commission structures, and merchant information to operate and expand Defendants' competing platform in direct violation of the MSA's post-termination obligations.

### F. <u>Post-Termination: Defendants Continue Their Unlawful Competition Using Stolen Information</u>

74. Even after the Agreement was terminated and Defendants' fraud and theft were exposed, Defendants persisted in aggressively competing against Seel using its stolen business model, pricing algorithms, customer and merchant lists (including information on Seel's highest-value accounts), product specifications and features, and sales and marketing strategies.

75. On information and belief, in 2025 Defendants continued to approach online

merchants—including many of Seel's existing merchant-partners—to attempt to convince them to switch to Defendants' post-purchase services by offering pricing and incentives that undercut Seel, leveraging the fact that Defendants no longer had to share any portion with Seel once the distribution partnership ended. Each such attempted conversion was achieved through improper use of Seel's confidential information—including knowledge of Seel's pricing model, partnership and compensation structures, merchant lists, and operational methods.

76. As part of their marketing efforts, Defendants made deceptive statements to assuage merchants and consumers. On information and belief, Defendants falsely claimed that they could lawfully service contracts in California when in fact they lacked the legal authority to do so, likely intending to persuade merchants that Defendants' offerings were legally compliant.

77. Defendants went so far as to appropriate Seel's own trademarked language in selling their services. Defendants and their affiliates have used the name "Worry-Free Purchase" on merchant websites to label the post-purchase services option provided by Defendants, using the designation as a service name and heading to market and offer post-purchase services that directly compete with Seel's services.

78. For example, in at least one instance appearing on the website for the retailer GTRacing, Defendants' materials expressly used Seel's Worry-Free Delivery mark.




79. Defendants' use of Seel's marks has created confusion among merchants. Because of Defendants' unauthorized use of Seel's marks, confusion is inherent, rendering a multi-factor likelihood of confusion analysis unnecessary.

80. Even where Defendants did not reproduce Seel's marks verbatim, they adopted confusingly similar designations and a nearly identical overall presentation that mimics Seel's branding so closely that the commercial impression conveyed to merchants and consumers is that Defendants' services are the same as, affiliated with, sponsored by, or a continuation of Seel's.

81. Seel has developed a distinctive, non-functional trade dress for its services encompassing the total image and overall appearance of the offering, including the structure and placement of the checkout module; the phrasing, hierarchy, and layout of the protection offer; the sequencing and design of the post-purchase service workflow; and the associated messaging, confirmations, and support interfaces. These choices were made for branding and customer-experience reasons—not functionality—and alternative designs are readily available. Deployed consistently across Seel's merchant network, this distinctive combination has acquired secondary meaning through extensive exposure and operates as a source identifier for Seel's services.

82. Defendants deliberately copied this trade dress. Defendants' platform replicates Seel's layout, sequencing, and presentation at checkout, using substantially similar phrasing, structure, and visual formatting in an interface that appears materially indistinguishable from Seel's. Defendants further mirrored Seel's refund process by adopting the same step-by-step order, form structure, prompts, and resolution flow, with closely matching design choices for confirmation messages, button placement, and navigation. By appropriating these elements to present a substitute service that looks and operates like Seel's—while using the Worry-Free Marks or colorable imitations in connection with directly competing services—Defendants have caused and are likely to continue causing confusion, mistake, and deception among merchants and consumers as to the source, origin, sponsorship, affiliation, or approval of Defendants' services, including the false impression of continuity or authorization.



## Extended Warranty Widget

xCotton | Seel

- Widget







- Modal







- Cart: EW Product info






- Terms and Conditions

| | |
|---|---|
| sp.xcottons.com | https://assets-global.website-files.com/6311e04b5d754a83a7c1e966/6543836754f7f1967f3a8013_FSCSC Consumer Goods TCs UT 06062023 (FINAL) (2).pdf |

## Protection Product Pricing

### xCotton

https://www.frizzlife.com/products/shipping-protection?_pos=1&_psq=shipping+proteci&_ss=e&_v=1.0




### Seel

https://remmotorcycle.co/products/worry-free-purchase




## Claim Flow

### xCotton

Step1: xCotton_login




Step2: xCotton_choose issue type




### Seel

Step1: Seel Portal_login




Step2: Seel Portal_choose issue type



Step3: xCotton_choose items




Step4: xCotton_upload docs




Step5: xCotton_select how you get paid




Step3: Seel Portal_choose items



Step4: Seel Portal_Select reason



Step5: Seel Portal_upload docs



Step6: Seel Portal_select how you get paid



### Xcotton: queryGoodsForClaim

Note: Response schema is similar to Seel's get-all-protected-item

▶ Request

▶ Response

### Seel: get-all-protected-item

▶ Request

▶ Response

83. To date, Defendants continue to copy Seel's products and services as they are launched into the market. For example, in March 2025, Seel introduced a compensation program—typically $5—for products delayed by over five days from the predicted estimated time of arrival. Seel was the first to launch this initiative, driven by extensive market research on consumer behavior and patterns, data gathered over the years, and collaboration with key logistics partners to enhance forecasting, timely delivery, and consumer assurance. This product offering has proven successful. Shortly thereafter, in May 2025, Defendants launched an identical product.

84. Defendants used Seel's trademarks, trade dress, and copied content in United States commerce after termination of the MSA by offering post-purchase services to United States-based merchants and consumers, processing transactions involving United States

customers, and displaying infringing content on websites accessible in and directed to the United States.

85. The consequences of Defendants' fraud, theft, and ongoing unlawful competition have caused significant harm to Seel. Seel has lost multiple merchant clients and associated revenue streams to Defendants' unlawfully competing platform. To date, Defendants have taken at least 31 merchant customers initially with Seel, resulting in a minimum revenue loss of millions of dollars. The disclosure of Seel's trade secrets and confidential business information is not easily remedied through monetary relief alone; the competitive advantage Seel developed over years risks further erosion the longer Defendants' conduct continues.

86. In sum, Defendants' fraud and systematic theft have caused Seel to suffer millions of dollars in monetary damages, as well as irreparable harm to Seel's market position, customer relationships, and proprietary assets. These injuries continue to compound each day that Defendants operate their copycat business. Further, Seel has also expended substantial money and resources investigating Defendants' misconduct, responding to merchant confusion, reassuring partners regarding Seel's legitimacy and compliance, and mitigating damage to its business relationships.

### G. Defendants Further Unfairly Compete by Defaming Seel

87. In a further attempt to destroy the business they had already stolen from, upon information and belief, Defendants (directly and/or through individuals and entities controlled by them) launched a coordinated smear campaign against Seel across multiple media platforms.

88. In or around May 2025, a wave of "anonymous" emails was sent to a large number of Seel's merchant partners. These emails pretended to be from neutral Mandarin-speaking merchants sharing an allegedly friendly warning, but were in fact orchestrated by Defendants. The emails accused Seel of illegally selling insurance in mainland China, claimed that Seel had compliance issues with Chinese authorities, and warned merchants that using Seel's products could be legally risky—even speculating that Seel's services contracts in the United States might be void or that merchants might face liability for partnering with Seel. (Exhibit E.) While these emails were originally sent in Chinese, an English translation of one such email is

provided below:

**Subject:** SEEL suspected of engaging in illegal insurance activities in mainland China — Cross-border sellers please beware of potential risks

**From:** dauihdian@outlook.com
**To:** info@gadgethyper.com

---

**Dear fellow cross-border sellers,**

Hello everyone!

Like many of you, I am a regular seller operating on Shopify. I recently noticed some media reports in China claiming that **SEEL is suspected of conducting illegal insurance business in mainland China**, and that **SEEL may have compliance issues with insurance operations in China!**

---

**Potential risks we might face:**

1. **Contracts may be void:** If SEEL does not have an insurance license in China, the "protection services" they offer may not be legally protected, and our business cooperation with them may not be recognized. If legal disputes arise, we may not be protected under the law.
2. **Misleading insurance product claims:** SEEL may lack qualifications to sell insurance in China. They may not bear legal responsibility for their promotional materials, which could result in misleading claims or false information during sales.
3. **Exposure to legal risks:** Product pages, shopping carts, checkout pages, or even promotional materials that include SEEL's "insurance" claims could be deemed as aiding illegal operations, potentially leading to legal trouble.

---

**My personal suggestions:**

✅ Unless SEEL can provide evidence that it is not conducting illegal insurance business in China, use SEEL's insurance services with caution.
✅ Retain all contracts and transaction records to protect yourself in case any issues arise.

89. These statements are utterly false and misleading—Seel does not offer its service to consumers in mainland China and conducts its business lawfully and in compliance with all applicable laws in the markets it serves. Any claim of illegal activity or compliance issues in China is unequivocally unfounded. The clear purpose of the fraudulent emails was to scare merchants away from using Seel by spreading fear, uncertainty, and doubt about Seel's legality.

90. The defamatory emails were sent from generic email addresses from Outlook or Foxmail accounts to hide the senders' identities. However, some vigilant merchants who received the emails found them suspicious and promptly forwarded them to Seel.

91. As these reports came in, it became obvious that this was a coordinated attack on

Seel's reputation. With the help of cooperative merchants, Seel discovered indisputable digital evidence that traced the source of these emails back to IP addresses and entities associated with Defendants and/or their global affiliates, including locations in Shanghai, China. A follow-up in-person investigation in China uncovered evidence indicating that Defendants either directly carried out, or orchestrated through affiliated entities or agents, the "anonymous" email campaign.

92. On May 14, 2025, at approximately 5:50 PM, one of Seel's merchant partners received an email from the address "aliang60@outlook.com" claiming to be from a fellow cross-border merchant and falsely accusing Seel of selling insurance without proper Chinese licenses. The merchant immediately forwarded this defamatory email to Seel. To identify the sender, Seel employed standard digital forensic techniques. Seel generated an encrypted tracking URL (https://wl.gl/seel) that, when accessed, would collect the visitor's IP address, device information, and other digital identifiers before redirecting to Seel's public website. Through the cooperating merchant, Seel sent a reply to the email address containing this tracking link.

93. On May 15, 2025, at 9:37 AM Beijing time, the tracking link was accessed from IP address 180.158.87.35, located in Shanghai, China. Public IP address geolocation databases confirmed this IP address originated from Wuning Road, Putuo District, Shanghai —the exact street address where Xiaomianhua maintains its publicly-listed office location (per Xiaomianhua's Chinese official website [https://xcotton.cn/xmh] and public information available on Tianyancha [a platform integrating information on Chinese enterprises]). To obtain conclusive, legally admissible evidence, Seel's representatives conducted an on-site investigation at Xiaomianhua's Shanghai office location. Upon arrival at the office, Seel's representatives observed that the office Wi-Fi credentials were publicly displayed on the wall, showing: Network Name: "TP-LINK_9374" and Password: "11223344." Seel's representatives connected to this Wi-Fi network and accessed a second tracking URL (https://bc.ax/szip) created specifically for verification purposes. The IP address generated by this on-site connection was identical to the IP address that had accessed the merchant's reply email the previous day: 180.158.87.35.

94. Seel's representatives preserved photographic and video evidence of the on-site investigation, including: (a) images showing the Wi-Fi credentials posted on the office wall, (b) screenshots of the Wi-Fi connection to "TP-LINK_9374," (c) screenshots showing the matching IP address (180.158.87.35) from both the email sender's access and the on-site verification, and (d) video documentation of the investigation process. This evidence conclusively establishes that the "anonymous" defamatory email sent to Seel's merchant partner on May 14, 2025 originated from Defendants' Shanghai office.

95. Further analysis of Seel's server logs revealed that the same IP address (180.158.87.35) had previously accessed Seel merchant partners' websites on multiple occasions, including: (a) May 7, 2025 at 1:04 PM Beijing time using Windows 10 and Chrome browser, and (b) May 12, 2025 at 6:28 PM Beijing time using iOS Safari browser. This pattern of systematic reconnaissance demonstrates that Defendants were actively surveilling Seel's merchant relationships and gathering competitive intelligence in the weeks leading up to the defamatory email campaign.

96. In or around the same period of time, on information and belief, Defendants initiated and disseminated a series of false and defamatory publications concerning Seel through Chinese-language digital media channels. These publications were designed to portray Seel as an unlawful, unlicensed, and unreliable insurance provider operating outside regulatory oversight, and to deter merchants, partners, and investors from doing business with Seel.

97. The defamatory content did not arise organically from independent reporting or consumer complaints. Instead, Seel's review identified multiple instances in which materially identical or near-identical articles—sharing the same or substantially similar headlines and text—were republished across numerous platforms over time. This pattern indicates a coordinated strategy to seed false accusations from a single source and then amplify them through aggregation, mirroring, and secondary reposting.

98. The defamatory publications concerning Seel were disseminated across a wide range of Chinese-language digital platforms, including:

a. Major news portals and content aggregation platforms, including Sina, Sohu,

NetEase, Toutiao, and Baidu, which republished or algorithmically distributed the same content under institutional or news-style labels;

b. Social media platforms, including official or verified accounts on WeChat and Weibo, where the articles were presented as authoritative risk alerts or industry warnings;

c. Investment and trading communities, including East Money and Snowball (Xueqiu), where the content was directed to investors and market participants; and

d. Specialized insurance and financial commentary outlets, including Tiger Finance.

99. A substantial number of these defamatory articles were published or attributed to a single recurring source identifier—"Zhongbao Xinzhi" (中保新知)—which appeared consistently across multiple platforms and content ecosystems. Although the articles appeared on numerous platforms, they do not appear to reflect independent reporting, regulatory action, or investigative findings. Instead, they consisted of verbatim or near-verbatim reproductions of the same core accusations, amplified through aggregation, mirroring, and secondary reposting. The repeated use of the same handle and substantially similar text across distinct platforms indicates that the defamatory content originated from a single source and was deliberately disseminated through multi-platform syndication and redistribution mechanisms to maximize reach, repetition, and reputational harm by creating the false impression of widespread corroboration.

100. First, the publications falsely accused Seel of selling illegal insurance products in China, with headlines and body text expressly or implicitly stating that Seel was suspected of selling insurance without authorization or engaging in unlicensed insurance operations. Seel has never sold or attempted to sell insurance policies to Chinese consumers or businesses.

101. Second, the publications repeatedly disseminated false accusations of consumer harm and refund denials through a fabricated anecdote that was reproduced across multiple platforms. This invented narrative described a purported cross-border merchant who allegedly encountered obstacles during a dispute after Seel supposedly declared a service plan invalid due to an alleged lack of overseas licensing or registration in China. The articles falsely asserted that, as a result of these purported licensing deficiencies, service requests went unanswered and the

merchant bore all resulting costs. This false anecdote was used to suggest consumer harm and to support the baseless allegation that Seel lacks operational legitimacy.

102. Third, to lend false authority and credibility to their accusations, the publications selectively cited or paraphrased regulatory concepts drawn from United States insurance law and related regulatory frameworks, presenting those concepts as proof that Seel's operations were unlawful, unauthorized, or unregulated. In doing so, the publications implied that Seel lacked required approvals and therefore fell outside established oversight and consumer-protection regimes. These implications were false and misleading. Seel operates in compliance with all applicable laws and has not engaged in any unlawful or improper conduct.

103. Fourth, the publications falsely characterized Seel's business model as intentionally operating without adequate safeguards, suggesting that Seel positions itself in ambiguous regulatory spaces to evade oversight and thereby exposes merchants to undisclosed risks. These statements falsely portrayed Seel as reckless, noncompliant, and indifferent to consumer and merchant protection.

104. Fifth, the publications referenced and grossly misrepresented a consumer lawsuit filed against Seel, falsely characterizing it as credible evidence of widespread consumer harm and "systematic failure" in Seel's resolution processing and customer service operations. The publications prominently featured references to a lawsuit seeking $20 million in damages, presenting this filing as proof validating their accusations of Seel's operational deficiencies, consumer injuries, and legal noncompliance. In reality, the lawsuit—which has since been settled for a low three-figure nuisance payment—was a five-page complaint filed by a single plaintiff that failed to state cognizable causes of action, lacked any factual or legal merit, and was not representative of any pattern of consumer complaints or legitimate grievances. The lawsuit was not a class action, was not filed by multiple consumers, did not establish any actual operational failures, and was not based on systematic issues or widespread harm. By presenting this meritless filing—which any competent attorney would immediately recognize as frivolous—as if it were credible evidence of Seel's alleged misconduct and "systematic failure," and by omitting the critical context that would have revealed its baseless nature, the publications created a materially

false and misleading impression designed to harm Seel's reputation and deter business partners, investors, and merchants from working with Seel.

105. Upon information and belief, Defendants caused these publications to be disseminated. Investigation into the publishers of some of the aforementioned defamatory articles revealed coordination among affiliated entities. Multiple articles were published by accounts and platforms controlled or connected to Shanghai Three Friends Technology Co., Ltd. (上海三个朋友科技有限公司), a company with only five employees contributing to social insurance and whose legal representative is subject to high-consumption restrictions due to unpaid debt judgments—a penalty under Chinese law restricting luxury spending by judgment debtors. This same entity has connections to Xiaomianhua Digital Technology and other related corporate entities in Defendants' network, as evidenced by shared corporate affiliations, common personnel, and coordinated publication timing.

106. Direct evidence establishes that Bruce Chen personally disseminated the defamatory content and attempted to coordinate with business partners in the campaign against Seel. In a WeChat conversation from late 2025, Bruce Chen shared with the Chief Executive Officer of a business partner of Xcotton one of the defamatory articles headlined "Tech Company Selling Insurance: Seel Suspected of Operating Insurance Business Without License," published by Baoguan (保观). Chen actively solicited reactions, asking: "What do you think about this?" accompanied by laughing emojis. The executive responded with advance knowledge of Defendants' planned future attacks, stating: "Look at the follow-up about Seel later," demonstrating that Xcotton's business partners had insider knowledge of an ongoing, coordinated defamation campaign. Chen acknowledged having 680 friends in his WeChat network who follow the Baoguan platform indicating wide potential dissemination of the defamatory content. The conversation reveals not only Chen's personal role in spreading the defamation but also the existence of a coordinated effort to systematically attack Seel's reputation.

107. As alleged above, Defendants had direct knowledge of Seel's business model and operations through their prior distribution partnership and improperly obtained access to Seel's

confidential information. Defendants were fully aware that Seel's services are legitimate and lawful—indeed, Defendants had been selling those same services as Seel's authorized distribution partner before misappropriating Seel's business. Defendants nonetheless caused these false accusations to be disseminated with the intent to harm Seel's business, create doubt and confusion among merchants, and induce those merchants to sever ties with Seel and turn to Defendants' competing service as part of a deliberate, retaliatory scheme to destroy Seel's reputation and business relationships.

108. The systematic nature of the campaign—including targeted surveillance of Seel's merchant partners (evidenced by May 7 and May 12, 2025 website access from the same IP address), followed by coordinated "anonymous" emails and synchronized media publications—demonstrates premeditation and malice. Defendants' intent was to harm Seel's business, create doubt and confusion among merchants, induce those merchants to sever ties with Seel, and redirect business to Defendants' competing service—all as part of a deliberate, retaliatory scheme to destroy Seel's reputation and business relationships after Defendants' theft of Seel's trade secrets and business model was discovered.

109. The defamation campaign was not merely retaliatory—it served Defendants' immediate commercial objectives. While publicly spreading false accusations that Seel operated an illegal insurance business, Defendants were simultaneously and aggressively expanding their competing business using Seel's stolen business model. In the same March through August 2025 timeframe during which the defamatory publications circulated, Bruce Chen systematically recruited major industry players including two of Seel's significant existing accounts. Bruce shared materials titled "Xcotton US Package Extended Warranty Insurance Service" and solicited those recipients to "join us" or "start from cooperation" to offer competing products that were substantially similar to Seel's offerings. Chen's recruitment pitch included offers to "take over" potential partners' existing operations. This contemporaneous evidence reveals Defendants' dual strategy: destroy Seel's reputation with false compliance accusations while simultaneously building Xcotton's competing business on Seel's stolen foundation. The defamation campaign thus served as commercial warfare—eliminating the legitimate competitor

(Seel) whose business model Defendants had stolen, thereby clearing the market for Defendants' fraudulently-created copycat operation.

110. As a direct and proximate result of Defendants' defamatory publications, Seel has suffered harm to its reputation and standing in the business community, as well as special damages in the form of specific pecuniary losses. Even where merchants alerted Seel about the false emails, the mere suggestion of legal trouble has tarnished Seel's reputation in the close-knit e-commerce community. Seel has had to spend further time and resources reassuring partners of its compliance and legitimacy.

### H. Defendants' Fabrication of Evidence in Support of False Regulatory Complaints, Resulting in Deception of Chinese Government Regulators and Misuse of Resources

111. In furtherance of their scheme to destroy Seel's business, Defendants escalated beyond mere defamatory publications to the active fabrication of fake evidence—including a sham e-commerce store and fictitious consumer identity—and the filing of false regulatory complaints with Chinese governmental authorities, all designed to deceive the Chinese government into taking action against Seel's affiliated entity. Upon information and belief, Defendants created a fake Shopify store under the name "Lemesi," established a fictitious consumer identity, and orchestrated a sham transaction to generate fabricated "evidence" that an affiliate of Seel had sold insurance to a Chinese citizen located within mainland China—conduct that, if true, would violate Chinese insurance regulations. Defendants then submitted this manufactured evidence to the Shanghai Financial Regulatory Bureau in multiple formal complaints filed through different regulatory channels, falsely alleging that Seel's affiliated entity was operating an illegal insurance business in China.

112. The fabricated evidence scheme included the following elements: (a) creation of a Shopify store named "Lemesi" that purported to be a legitimate merchant website; (b) installation of Seel's plugin on the fake store on or around May 6, 2025; (c) generation of a fake purchase order using a fictitious consumer identity; (d) creation of fabricated documentation suggesting the fake transaction involved a Chinese citizen physically located in mainland China; and (e) submission of this manufactured evidence to Chinese regulatory authorities as part of

formal complaints against Seel's affiliated entity.

113. Defendants filed multiple complaints with the Shanghai Financial Regulatory Bureau using the fabricated Lemesi evidence, submitting reports through different administrative channels including the petition office (信访办) and the consumer protection office (消保处). Evidence suggests Defendants may have filed complaints under different complainant identities to create the false impression of multiple independent reports of misconduct. The Shanghai Financial Regulatory Bureau's own records indicate confusion about the identity of the actual complainant, with staff unable to locate consistent records across the different complaint channels. This pattern of filing duplicative complaints through multiple channels using fabricated evidence demonstrates Defendants' systematic effort to weaponize the regulatory process against Seel. Defendants also submitted these complaints to the Office for Combating Illegal Financial Activities (打非办).

114. As a result of Defendants' false complaints supported by fabricated evidence, Seel's affiliated entity was forced to: (a) retain Chinese legal counsel to respond to the investigations; (b) provide evidence that Shopify merchants' domain registrations cannot be traced through public channels; (c) demonstrate that Shopify Payments does not support Chinese mainland entities; (d) explain IP address geolocation controls that prevent sales to Chinese consumers; and (e) submit certified documents to regulatory authorities.

115. Defendants fabricated fake evidence—including a sham e-commerce store and fictitious consumer identity—to deceive the Chinese government and waste regulatory resources, and filed false regulatory complaints for the express purpose of: (a) creating the false appearance of governmental validation for their defamatory accusations; (b) forcing Seel's affiliated entity to divert resources to its defense rather than business operations; (c) generating additional negative publicity that could be used in future defamatory publications referencing "regulatory investigations"; (d) intimidating business partners by suggesting regulatory scrutiny; and (e) potentially obtaining confidential business information about the operations of Seel's affiliated entity through the regulatory investigation process. The fabrication of evidence demonstrates that Defendants knew their accusations against Seel's affiliated entity were false—if the affiliated

entity was actually violating Chinese insurance regulations, Defendants would not have needed to manufacture fake evidence to support their complaints.

**FIRST CAUSE OF ACTION**

**(TRADEMARK INFRINGEMENT (15 U.S.C. § 1114))**

(Against All Defendants)

116. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

117. Seel owns federally registered trademarks Worry-Free Delivery and Worry-Free Purchase. These marks are valid, protectable, and have acquired secondary meaning through Seel's extensive use and promotion.

118. As detailed above, through Seel's use and promotion of the Worry-Free marks in interstate commerce, the marks have acquired secondary meaning such that relevant consumers—including online merchants and shoppers—associate them exclusively with Seel's high-quality post-purchase services. The marks are distinctive as applied to Seel's services, as evidenced by their registration and the marketplace recognition Seel has achieved.

119. Without Seel's consent, Defendants have used the Worry-Free marks, in interstate commerce to advertise and offer competing post-purchase services built using information stolen from Seel. Because Defendants used Seel's identical marks without authorization, confusion is inherent and dispositive of trademark infringement, rendering a multi-factor likelihood of confusion analysis unnecessary.

120. And, even where Defendants did not use the marks verbatim, they have used confusingly similar designations that mimicked Seel's branding and marketing so closely that the overall impression is that Defendants' product is the same as or affiliated with Seel's.

121. Defendants' use of the Worry-Free Marks (or any colorable imitation) in connection with similar services is likely to cause—and has already caused—confusion, mistake, and deception among ordinary purchasers as to the source, sponsorship, affiliation, or approval of Defendants' services.

122. As a direct and proximate result of Defendants' infringing conduct, Seel has

suffered damages in an amount to be proven at trial.

123. Defendants' acts of infringement have been willful, deliberate, and in conscious disregard of Seel's trademark rights. Accordingly, Seel is entitled to an award of enhanced damages and/or treble damages under 15 U.S.C. § 1117, as well as an award of Defendants' profits and Seel's attorneys' fees due to the intentional nature of the violation.

124. Defendants' infringement of the Worry-Free marks has caused and, if not enjoined, will continue to cause Seel to suffer irreparable harm to its business, reputation, and goodwill. Unless restrained by this Court, Defendants are likely to continue their infringing use as part of their ongoing fraudulent scheme, causing ongoing confusion and harm.

## SECOND CAUSE OF ACTION

## (FALSE DESIGNATION OF ORIGIN, TRADE DRESS INFRINGEMENT, PRODUCT DISPARAGEMENT, TRADE LIBEL, AND UNFAIR COMPETITION (15 U.S.C. § 1125(A) – LANHAM ACT))

(Against All Defendants)

125. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

126. Seel developed and uses a distinctive, non-functional trade dress in connection with its Worry-Free post-purchase services. That trade dress consists of the overall look and feel of the service as presented to merchants and consumers, including the particular combination and arrangement of specific visual, structural, and textual elements:

a. The placement of Seel's post-purchase services offers directly within the merchant checkout flow, following product selection but prior to payment confirmation;

b. The use of standardized headings and descriptors communicating Worry-Free services in close proximity to the purchase price;

c. The sequencing and structure of disclosures explaining the scope of post-purchase services, applicable limitations, and eligibility criteria in a layered, consumer-friendly format;

d. The presentation of a streamlined post-purchase service-request workflow, including uniform prompts, confirmations, and status updates; and

e. The consistent visual hierarchy, layout, and formatting of related confirmation emails, FAQs, and customer-support materials associated with the post-purchase service.

127. Seel's trade dress is non-functional. The specific selection, coordination, and arrangement of the elements comprising Seel's trade dress are arbitrary and aesthetic choices, not functional necessities. The particular visual presentation, language, sequencing, and design choices embodied in Seel's service are not dictated by technical necessity, regulatory requirements, or common industry practice. Numerous alternative designs, layouts, wordings, and workflows are available to competitors to offer post-purchase services without adopting Seel's particular combination and presentation of elements. The same services could be offered using materially different wording, layout, sequencing, and user-interface structures without affecting cost, quality, or performance.

128. Through extensive and continuous use, promotion, and commercial success, Seel's trade dress has acquired secondary meaning in the relevant marketplace. Merchants and consumers encountering the distinctive presentation of Seel's post-purchase services have come to associate that presentation with Seel as the source. In particular, Seel's trade dress has been displayed across thousands of merchant websites serving United States consumers, generating millions of consumer impressions during the checkout and post-purchase process. Seel has devoted significant resources to promoting and standardizing this presentation across its merchant integrations.

129. As alleged in detail above, Defendants copied and used Seel's trade dress in connection with Defendants' competing post-purchase service, which was built using Seel's stolen confidential information. Defendants replicated the total image and overall appearance of Seel's offering, including substantially identical customer-facing language, structure, workflows, and documentation, and presented their service to merchants and consumers in a manner that was indistinguishable from Seel's.

130. Defendants' conduct constitutes false designation of origin and false association because Defendants' use of Seel's branding, terminology, trade dress, and customer-facing service presentation falsely suggests that Defendants' services are affiliated with, sponsored by, authorized by, or a continuation of Seel's services, when they are not. In connection with their goods and services, Defendants have used words, names, devices, and trade dress, and engaged in conduct, that falsely designate the origin or sponsorship of their services.

131. Defendants' use of Seel's trade dress was and is likely to cause confusion, mistake, or deception among merchants and consumers as to the source, sponsorship, affiliation, connection, association, or approval of Defendants' services. The likelihood of confusion is amplified by Defendants' prior role in delivering Seel's authentic service and their subsequent substitution of a cloned service built on misappropriated information, creating the false impression that the service provider had not changed. Defendants' actions were intended to, and likely did, deceive merchants and consumers into thinking that Defendants were somehow affiliated with, or a continuation of, Seel—thereby allowing Defendants to benefit from the fraud and theft.

132. Defendants' adoption and use of Seel's trade dress was intentional and willful. Defendants' adoption of substantially identical presentation choices was not driven by functional considerations, but rather by a desire to capitalize on the recognition and goodwill Seel had developed in its distinctive trade dress. As alleged above, Defendants obtained Seel's proprietary business documentation, operational materials, and customer-facing content through fraud and misuse of confidential information, and deliberately reused those materials to accelerate their market entry and trade on Seel's goodwill.

133. In addition to the false designation of origin and trade dress infringement described above, Defendants' defamatory publications constitute product disparagement, trade libel, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

134. Defendants' publications described above constitute commercial advertising or promotion within the meaning of the Lanham Act because they were made for the purpose of

influencing merchants to refrain from purchasing Seel's services, were sufficiently disseminated to the relevant purchasing public, and referred to Seel's specific commercial products and services.

135. Defendants' publications made literally false representations of fact in commercial advertising concerning Seel's products, including that: (a) Seel operated an illegal or unlicensed insurance business; (b) Seel's services violated applicable insurance laws; (c) Seel exposed merchants to regulatory or financial risk; (d) Seel's contracts were void due to licensing deficiencies; and (e) Seel refused to honor valid service requests.

136. These false statements were material to purchasing decisions because they concerned the fundamental legality, reliability, and commercial viability of Seel's services.

137. On information and belief, Defendants caused these representations to enter United States commerce. Although published primarily in Chinese-language media, they were accessible to and intended to reach Chinese merchants doing business in or with the United States market, including Mandarin-speaking merchants who constitute a meaningful portion of Seel's customer base. The defamatory emails were sent directly to Seel's merchant partners, many of whom operate in or sell to the United States market.

138. On information and belief, these false statements have actually deceived and are likely to continue to deceive a substantial portion of the relevant purchasing public, including current and prospective merchant customers of Seel.

139. As a direct and proximate result of Defendants' false designation of origin, trade dress infringement, false advertising, commercial disparagement, and unfair competition, Seel has suffered commercial injuries and damages, including loss of business, loss of customers, dilution of the distinctiveness and value of its trade dress, and damage to its reputation and goodwill, in an amount to be proven at trial. Seel is entitled to recover Defendants' profits attributable to the violations, its actual damages, and the costs of this action pursuant to 15 U.S.C. § 1117.

140. Defendants' willful trade dress infringement, false designation of origin, and false advertising were carried out as part of a fraudulent scheme to misappropriate Seel's business.

This conduct renders this an exceptional case under 15 U.S.C. § 1117(a), entitling Seel to recover treble damages and/or Defendants' profits, as well as attorneys' fees.

141. Defendants' false designation of origin, trade dress infringement, false advertising, commercial disparagement, and unfair competition have caused and will continue to cause irreparable harm to Seel. The injury to Seel's business reputation, the dilution of its brand identity, impairment of Seel's ability to control its branding and marketplace presentation, and resulting consumer confusion constitute irreparable harm with no adequate remedy at law. Unless enjoined, Defendants will continue to trade on Seel's identity and goodwill, disseminate false statements about Seel's services, further confuse the marketplace, and deprive Seel of control over its brand.

**THIRD CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**

(Against All Defendants)

142. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

143. As detailed above, Seel possessed and possesses certain trade secrets, including a proprietary pricing model and confidential risk assessment methodologies; confidential channel partner commission structures and revenue-sharing arrangements; confidential business documentation regarding merchant onboarding processes, post-purchase service workflows, customer service protocols, marketing strategies, merchant pitch materials, integration methodologies, and performance metrics; and merchant lists and client-specific information, including which merchants were using or considering Seel's services, their specific terms and pricing, and relationship details (collectively, the "Seel Trade Secrets").

144. The Seel Trade Secrets do not consist of generalized business ideas or public knowledge. Rather, they consist of specific, non-public compilations, configurations, and methodologies developed by Seel through substantial investment, including the particular variables, structures, decision rules, and configurations embodied in the pricing model, post-

purchase service workflows, and commission structures described above.

145. Each category of Seel Trade Secrets derives independent economic value from not being generally known and from the difficulty competitors would face in independently developing comparable systems without access to Seel's confidential information.

146. Defendants used the misappropriated trade secrets to develop and operate their competing platform. All Defendants benefited from, directed, authorized, controlled, and participated in the misappropriation and use of Seel's trade secrets.

147. Seel's trade secrets relate to products and services used in, or intended for use in, interstate and foreign commerce. Seel uses its confidential and proprietary information to serve clients throughout the country from its base of operations in San Francisco, California.

148. Seel took reasonable measures to keep such information secret, including restricting access to it, disclosing it only under nondisclosure agreements or the confidentiality provisions of contracts (such as the MSA), and employing security measures for its data.

149. As described above, Defendants misappropriated Seel's trade secrets by acquiring, using, disclosing and/or intending to use or disclose Plaintiff's trade secrets in violation of 18 U.S.C. § 1832(a). Seel therefore has a private right of action for the misappropriation of its trade secrets pursuant to 18 U.S.C. § 1836(b)(1).

150. As a direct and proximate result of Defendants' misappropriation of Seel's trade secrets, Seel has suffered irreparable injury as well as (i) actual damages and (ii) damages for unjust enrichment not addressed in computing damages for actual loss or (iii) a reasonable royalty for the Defendants' misappropriation of Seel's trade secret.

151. At all times herein alleged, Defendants' acts were malicious, fraudulent and oppressive, and were done with a conscious disregard of Seel's rights, all within the meaning of 18 U.S.C. § 1836(b)(3)(C), in that Defendants misappropriated Seel's confidential, proprietary and/or trade secret information intentionally and knowingly and with deliberate intent to injure Seel's benefit for their own gain. Therefore, Seel is entitled to an award of exemplary damages and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

**FOURTH CAUSE OF ACTION**

**(VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 ET SEQ.)**

(Against All Defendants)

152. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

153. Defendants, by the conduct alleged above, have engaged in unlawful, unfair, and fraudulent business acts or practices, in violation of California's Unfair Competition Law (the "UCL"), Business & Professions Code § 17200 et seq., to harm Seel, with knowledge and disregard of Seel's rights, and with the intention of causing harm to Seel and benefitting Defendants.

154. Defendants' conduct as alleged herein constitutes, "unlawful," "unfair" and/or fraudulent," business acts or practices in violation of California Business & Professions Code §§ 17200 et seq.

155. Defendants' actions constitute "unlawful" business acts under the UCL because they violate numerous statutes and common law duties, including but not limited to: the Defend Trade Secrets Act (systematic misappropriation of trade secrets through fraud), the Lanham Act (trademark infringement and false designation of origin), and California common law (fraud, intentional misrepresentation, fraudulent concealment, promissory fraud). Each of these violations constitutes a predicate unlawful act for UCL purposes.

156. Defendants' conduct is "unfair" in that it offends established public policies, is immoral, unethical, oppressive, and unscrupulous, and has caused substantial injury to Seel (and threatens injury to consumers and competition) that is not outweighed by any legitimate benefits. Defendants gained an inequitable competitive advantage by systematically defrauding a distribution partner to steal that partner's most valuable assets and then competing against that partner using the stolen assets. Perpetrating an elaborate fraud to steal trade secrets, betraying a purported joint venture entered through misrepresentations, stealing years of investment in research and development, and spreading falsehoods to harm a competitor are practices that

violate the fundamental rules of fair competition and basic business ethics. The harm to Seel (losing its market position, intellectual property, and years of investment in developing its business structure) was not avoidable and was caused not by ordinary competition on the merits, but by systematic fraud, deception, and theft. Defendants' conduct has also had or could have adverse effects on consumers and merchants. No societal benefit justifies Defendants' fraudulent and thieving practices; the gravity of the harm to Seel and the marketplace far outweighs any utility of Defendants' behavior.

157. Defendants' conduct is "fraudulent" under the UCL because it was systematically designed to deceive members of the public and was likely to deceive. Defendants made numerous misrepresentations and omissions (detailed in the fraud-related counts) with the intent that Seel and others rely on them. They systematically deceived Seel into believing in a bona fide distribution partnership when the entire relationship was a fraud designed to steal Seel's business. They deceived merchants and consumers into thinking their service was affiliated with Seel or was a legitimate independent service, when it was actually built on stolen information. They sent fraudulent defamatory emails designed to deceive merchants about Seel's legality. These acts were likely to mislead and did mislead the targets of the statements. The deception occurred in connection with the sale of services and thus falls within the ambit of fraudulent business practices under the UCL.

158. Seel has standing to bring this UCL claim because Seel has suffered an injury in fact and lost money or property as a result of Defendants' unfair competition, including investigative costs, mitigation expenses, and lost or delayed merchant revenue caused by Defendants' misconduct.

159. As a direct and proximate result of Defendants' violation, Seel has incurred damages in an amount to be proven at trial. Seel is also entitled to equitable remedies, including injunctive relief and restitution.

## FIFTH CAUSE OF ACTION

## (DEFAMATION)

(Against All Defendants)

160. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

161. As described in the preceding allegations, Defendants—whether acting on their own behalf or through agents, affiliates, and alter ego entities—published defamatory statements concerning Seel through two coordinated channels: (a) "anonymous" emails sent directly to Seel's merchant partners in or around May 2025, and (b) a syndication campaign of substantially identical articles published simultaneously across dozens of major Chinese media platforms, financial news portals, social media official accounts, and investment community forums. These false statements were sent or made available to numerous third-party recipients, including both current and potential merchant customers of Seel, as well as prospective business partners and the general business community. Third parties received and reviewed these published communications.

162. These statements were made as statements of false facts, not opinion, and concerned Seel's business conduct, legal compliance, and the validity of its services. The statements were capable of being proven true or false and were presented as factual assertions about Seel's legal status and operations.

163. The statements published by Defendants were false. As alleged above, Seel conducts its business lawfully, and its contracts are valid and enforceable. Defendants' accusations of illegality, regulatory noncompliance, contract voidness, consumer harm resulting from refused service requests, and fraudulent business practices had no factual basis.

164. The statements were defamatory per se because they falsely imputed criminal conduct to Seel (operating an illegal insurance business), unfitness and dishonesty in its business (compliance failures, regulatory violations, evasion of oversight, and fraudulent concealment of risks), and asserted facts inherently prejudicial to Seel's profession (void contracts, refusal to honor service requests, exposure of merchants to liability, and operation of a deceptive

unauthorized scheme).

165. Defendants acted with at least negligence in publishing the false statements. At a minimum, Defendants failed to use reasonable care in verifying the truth of their accusations before mass-distributing them to Seel's business partners through "anonymous" emails and syndicated articles across multiple major media platforms. A reasonable person or entity would have investigated the truth of such serious allegations before publication.

166. However, Defendants' conduct actually far exceeds mere negligence because Defendants knew the statements were false or acted with reckless disregard for their truth. As alleged above, Defendants had direct, intimate knowledge of Seel's business model and operations through their prior distribution partnership and fraudulently obtained access to Seel's confidential information. Defendants were fully aware that Seel's services are legitimate and lawful—indeed, Defendants had been selling those same services as Seel's distribution partner and had stolen and cloned them for their own competing platform. Defendants nonetheless disseminated these false accusations of illegality with the intent to harm Seel's business. The coordinated nature of the publication campaign—with identical or substantially similar defamatory content appearing simultaneously across dozens of major media platforms under the same account, combined with targeted "anonymous" emails traced back to IP addresses and entities associated with Defendants and/or their global affiliates—demonstrates premeditation, planning, and malicious intent to inflict maximum reputational harm on Seel.

167. Defendants disseminated these false statements to create doubt and confusion among merchants, induce them to sever ties with Seel and turn to Defendants' competing service, and destroy Seel's reputation and business relationships.

168. Defendants' defamatory statements were not privileged and no legal justification excuses their publication.

169. As a direct and proximate result of Defendants' defamatory publications, Seel has suffered harm to its reputation and standing in the business community, as well as special damages in the form of specific pecuniary losses, as described above. Seel has also incurred expenses to investigate the source of the defamatory statements, mitigate the damage to its

reputation, and reassure partners of its compliance and legitimacy, constituting additional special damages. Accordingly, Seel seeks to recover compensatory damages for reputational harm and special damages for these economic losses, in an amount to be proven at trial.

170. Upon information and belief, Defendants acted with malice in publishing the false statements as part of a coordinated smear campaign. The campaign was intended to harm Seel's business, create doubt and confusion among merchants, and induce merchants to sever ties with Seel and turn to Defendants' competing service. Seel therefore also seeks punitive damages.

**SIXTH CAUSE OF ACTION**

**(TRADE LIBEL / PRODUCT DISPARAGEMENT)**

(Against All Defendants)

171. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

172. As alleged in detail above, Defendants, acting directly and/or through their agents, affiliates, and/or alter ego entities, published and disseminated false and disparaging statements concerning the nature, validity, and legal reliability of Seel's post-purchase services and products to third parties, including Seel's existing and prospective merchant customers.

173. As alleged above, Defendants disseminated "anonymous" mass emails and coordinated publications falsely asserting, among other things, that Seel's post-purchase services were illegal, unlicensed, unenforceable, invalid, or exposed merchants to regulatory, contractual, or financial risk, and that merchants using Seel's services could face liability or be left without coverage or recourse. These statements directly disparaged the quality, legality, and commercial usability of Seel's products and services.

174. The statements published by Defendants were statements of fact, not opinion, and were false. As alleged above, Seel's business and products are lawful and properly structured, and Defendants' accusations of illegality, compliance failures, or voidness had no factual basis.

175. Defendants published the disparaging statements knowing the statements were false or acted with reckless disregard for their truth. As alleged above, Defendants had direct knowledge of Seel's business model and operations through their prior relationship and

fraudulently obtained access to Seel's confidential information, and nonetheless disseminated false accusations as part of a retaliatory and competitive scheme. Defendants intended that the false statements be relied upon by Seel's merchants and business partners, and intended to cause harm to Seel's reputation, merchant relationships, and business prospects by inducing merchants to pause, terminate, or refrain from entering into business relationships with Seel.

176. As a direct and proximate result of Defendants' trade libel and product disparagement, Seel has suffered special damages, including specific pecuniary losses in the form of lost or delayed merchant relationships, reduced transaction volume, lost revenue, and expenses incurred to investigate, mitigate, and counteract the false statements, in amounts to be proven at trial. On information and belief, Defendants' false and disparaging statements regarding the legality, validity, and perceived risk profile of Seel's products materially influenced and contributed to merchants' decisions to suspend, delay, or reconsider their relationships with Seel, including in some instances merchants who later migrated to Defendants' competing platform. These product-focused falsehoods were among the factors contributing to the loss of merchant customers and associated revenue described herein, including the loss of at least 31 merchant customers and a minimum of millions of dollars in revenue.

177. Defendants' conduct was willful, malicious, oppressive, and undertaken with the intent to injure Seel and unfairly compete using fraudulently obtained advantages. Seel therefore seeks compensatory damages, punitive damages, and all other relief permitted by law.

**SEVENTH CAUSE OF ACTION**

**(BREACH OF CONTRACT)**

(Against All Defendants)

178. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

179. Seel and Defendant Xcotton Co. entered into the valid and enforceable MSA on or about November 1, 2023. The MSA was supported by adequate consideration, including, among other things, Seel's provision of access to confidential and proprietary business

information and agreement to share revenue, and Xcotton Co.'s agreement to promote and distribute Seel's products.

180. As alleged above, although Xcotton Co. was the nominal signatory to the MSA, Chen, Hoi, and Defendants Xcotton Insurance Services LLC and Xiaomianhua, exercised control over the negotiation, execution, and performance of the Agreement, directly benefitted from it, and used it as a vehicle for the wrongful conduct alleged. Accordingly, they are properly subject to liability for breaches of the MSA under alter ego, agency, assumption of contractual obligations, and related equitable principles. Further, the breaches of the MSA were carried out pursuant to a coordinated course of conduct among Defendants acting in concert, including directing and participating in the misuse of Seel's confidential information and exploiting the contractual relationship for improper competitive advantage. Each such Defendant is therefore liable for breach of contract and for all resulting damages and equitable relief.

181. Seel has performed all of its obligations under the MSA, or such obligations have been excused by Defendants' conduct

182. Defendants materially breached the MSA by: (a) using Seel's confidential information (customer list, pricing model, commercial and partnership structures, and operational documentation) to develop their own competing platform rather than solely to promote Seel's products as required; (b) failing to maintain confidentiality by sharing Seel's proprietary information throughout its organization to build the competing business; (c) breaching the goodwill covenant (Section 6.3) by defrauding Seel, stealing its business model, and defaming Seel rather than reflecting favorably on Seel's reputation; and (d) systematically diverting distribution partnership business to itself using stolen information and continuing unauthorized use of Seel's confidential information post-termination through the operation of a competing business built entirely on stolen information.

183. In the alternative, each non-signatory Defendant knew of the MSA and its restrictions, including through their direct involvement in contract performance and access to Seel's confidential information, and substantially assisted Xcotton Co.'s breach by encouraging, directing, facilitating, and profiting from the misuse of Seel's confidential information, the

development and operation of a competing platform, and the diversion of merchants and revenue away from Seel.

184. As a direct and proximate result of Defendants' breaches of the MSA, Seel has sustained significant damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

(Against All Defendants)

185. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

186. Under California law, every contract imposes on each party an implied covenant of good faith and fair dealing. This covenant required Defendants to act in good faith and not to do anything that would deprive Seel of the benefits of the MSA.

187. Seel performed all significant obligations under the MSA, including providing Defendants with access to confidential customer and business information, the pricing model, commercial and partnership arrangements, and operational documentation. All conditions required for Defendants' performance have occurred.

188. Defendants unfairly interfered with Seel's right to receive the contract benefits through systematic bad faith conduct: fraudulently entering the MSA with no intent to honor it; stealing confidential information to create a competing platform; systematically diverting Seel's clients using stolen information; and concealing these activities through continuous misrepresentations, all of which frustrated Seel's entire purpose in contracting and deprived Seel of expected gains.

189. Defendants' bad-faith conduct deprived Seel of the benefits of the Agreement beyond mere performance, including the exclusive opportunity to expand Seel's services through a trusted distribution partner and the confidentiality-protected advantage of Seel's proprietary business model.

190. As a proximate result of Defendants' breach of the implied covenant through systematic fraud and bad faith, Seel has been damaged in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**(INTENTIONAL MISREPRESENTATION)**

(Against All Defendants)

191. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

192. As detailed above, Defendants made material misrepresentations including that: (a) they intended to act as Seel's faithful distribution partner; (b) they would not compete or misuse Seel's information; (c) the collaborative relationship would generate substantial revenue (over $100M) for the parties; (d) they had ties to Mandarin-speaking merchants to leverage for Seel; and (e) their competing service would be limited to areas Seel did not/could not serve.

193. Defendants knew these representations were false when made. From the outset, Defendants planned to steal Seel's business model, partnership structure, and pricing algorithms. The speed with which Defendants launched their copycat operation immediately upon gaining access to Seel's confidential information proves this was the plan all along, not a change of heart.

194. Defendants made these false statements intending to induce Seel's reliance so that Seel would sign the MSA, share confidential information (including customer and partnership structures, pricing model, and commission structures), and refrain from seeking other partners.

195. Seel justifiably relied on these representations by entering the Agreement, providing confidential information, and investing resources in the distribution partnership. Seel had no reason to suspect the entire approach was fraud.

196. This reliance directly caused Seel substantial harm including loss of trade secrets, lost business opportunities, lost revenue, and costs of addressing the fallout, in amounts to be proven at trial but estimated in millions.

197. This deliberate fraud scheme carried out with oppression and malice from inception warrants punitive damages against Defendants to punish and deter such conduct.

**TENTH CAUSE OF ACTION**

**(NEGLIGENT MISREPRESENTATION)**

(Against All Defendants)

198. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

199. Defendants also made the representations described herein negligently and without reasonable basis. Even absent intentional deceit, Defendants owed Seel an independent duty to communicate truthful information about their capabilities, existing relationships, and present intentions because they possessed exclusive knowledge of their own operations and knew Seel was relying on their representations in deciding whether to enter into the MSA and disclose confidential information. This duty existed independently of any contractual obligations and arose from Defendants' voluntary decision to make affirmative factual representations to induce Seel's reliance.

200. As alleged in detail above, Defendants made multiple material representations of past and existing fact—not mere promises about future conduct—to Seel in connection with inducing Seel to enter the MSA and disclose its confidential information. These representations included statements concerning existing facts such as: Defendants' then-current market relationships and operational capabilities; Defendants' present state of mind and intentions regarding whether they would operate as a non-competitor distribution partner; the existing scope and geographic reach of any competing activities; and Defendants' current business plans and operations.

201. These representations were material to Seel's decision to enter into the relationship, execute the MSA, provide Defendants access to Seel's confidential information and operational know-how, and entrust Defendants with merchant-facing responsibilities.

202. Defendants breached their duty to communicate accurate information by making the foregoing representations of existing fact without reasonable grounds for believing them to be true. Among other things, Defendants lacked reasonable grounds to claim they would act as Seel's faithful distribution partner (which constituted misrepresentations of their then-existing

intent and business plans) while simultaneously undertaking steps inconsistent with that role, including planning, developing, launching, and/or operating a parallel competing service using Seel's confidential information, and diverting merchants and opportunities away from Seel. These were not mere breaches of contractual promises about future performance, but rather false statements about Defendants' existing state of affairs, capabilities, and present intentions at the time the representations were made.

203. Defendants intended, and reasonably should have expected, that Seel would rely on these representations in deciding to enter the MSA, disclose confidential information, provide ongoing support and operational documentation, and refrain from taking protective measures against Defendants' competing conduct.

204. Seel reasonably and justifiably relied on Defendants' representations by, among other things: entering the MSA; providing Defendants access to its confidential pricing model, risk methodologies, commission structures, operational and legal-compliance framework details, operational documentation, reports, and merchant-facing materials; investing time and resources in onboarding and supporting the purported collaboration; and allowing Defendants to act as Seel's merchant-facing representative.

205. As a direct and proximate result of Defendants' negligent misrepresentations and Seel's reliance, Seel suffered damages that extend beyond disappointed contractual expectations and arise from the fraudulent inducement itself, including but not limited to: loss of the secrecy and independent economic value of confidential information that Seel would not have disclosed absent the misrepresentations; loss of merchants and revenue diverted through Defendants' misuse of the disclosed information; loss of business opportunities; investigative and mitigation costs; and other consequential damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

## (FRAUDULENT CONCEALMENT (CONCEALMENT OF MATERIAL FACTS))

(Against All Defendants)

206. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

207. As alleged in detail above, Defendants knowingly concealed and suppressed material facts from Seel while continuing to solicit and receive Seel's confidential information and operational support, including that Defendants intended to compete with Seel, were contemporaneously developing and operating a competing post-purchase platform using Seel's confidential information, and were diverting merchants and business opportunities away from Seel.

208. Defendants had a duty to disclose the concealed facts to Seel. That duty arose because Defendants held themselves out as Seel's agent and representative in communications with merchants and in connection with technical integrations, thereby assuming a position of trust and confidence with respect to matters squarely within the scope of that relationship. Defendants' duty to disclose also arose from their exclusive knowledge of material facts that were unknown to Seel and not reasonably discoverable by Seel, including Defendants' internal development of a competing service and their efforts to divert or switch merchants, while Defendants controlled the relevant information and denied Seel meaningful access to it. In addition, Defendants actively concealed their competing activities while simultaneously continuing to solicit, receive, and exploit Seel's confidential information, conduct that independently gave rise to a duty to disclose. Finally, Defendants made partial representations and misleading half-truths that required full disclosure to avoid deception, including representing that they were acting as Seel's loyal distribution partner and that any competing service was limited in scope or geography, when in fact Defendants were pursuing a broader competing strategy inconsistent with those representations.

209. Defendants intentionally concealed these facts with the intent to defraud Seel and to induce Seel to continue the relationship, continue disclosing confidential information and operational know-how, continue supporting onboarding and merchant-facing activities, and refrain from taking steps to protect its trade secrets, merchant relationships, and business opportunities.

210. Seel was unaware of the concealed facts and would not have entered the MSA, disclosed its confidential information, allowed Defendants to act in a merchant-facing role, or

continued to support Defendants had Seel known the truth.

211. Seel reasonably and justifiably relied on Defendants' concealment and omissions by continuing to provide access to confidential information and support under the belief that Defendants were acting within the limited, permitted purpose of promoting Seel's products and not building a competing service.

212. As a direct and proximate result of Defendants' fraudulent concealment, Seel suffered damages, including but not limited to loss of trade secret value and secrecy, loss of merchants and revenue, lost opportunities, and investigative and mitigation costs, in an amount to be proven at trial.

213. Defendants' conduct was willful, malicious, oppressive, and fraudulent. Seel therefore seeks punitive damages against Defendants, in addition to compensatory and consequential damages, and such other relief as the Court deems just and proper.

**TWELVTH CAUSE OF ACTION**

**(PROMISSORY FRAUD (FALSE PROMISE))**

(Against All Defendants)

214. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

215. As alleged in detail above, Defendants, acting through Chen and others, made promises to Seel concerning their future conduct in order to induce Seel to enter into the MSA and to disclose Seel's confidential information and proprietary business model.

216. These promises included, among others, promises that Defendants would act as Seel's loyal and trusted distribution partner; would promote and distribute Seel's post-purchase services rather than compete with Seel; would use Seel's confidential information solely for the limited purposes authorized under the MSA; and would pursue a long-term, mutually beneficial relationship that enhanced Seel's business and goodwill.

217. At the time Defendants made these promises, Defendants had no present intention of performing them. As alleged above, Defendants instead intended from the outset to use the purported collaborative relationship and the MSA as a vehicle to obtain Seel's confidential

information, operational know-how, and business structure, and to use that information to develop and operate a competing post-purchase platform for Defendants' own benefit.

218. Defendants made these promises with the intent to induce Seel's reliance and to cause Seel to execute the MSA, provide access to its confidential information (including customer list, pricing model, commission structures, incentive programs, and operational documentation), invest time and resources in supporting the relationship, and refrain from taking steps to protect itself against Defendants' competing conduct.

219. Seel reasonably and justifiably relied on Defendants' promises by entering into the MSA, disclosing its confidential information and proprietary business model, supporting merchant onboarding and integrations, and entrusting Defendants with merchant-facing activities and discretion.

220. Defendants did not perform as promised and instead engaged in conduct directly contrary to their promises, including developing and operating a competing platform using Seel's confidential information and diverting merchants, opportunities, and revenue away from Seel.

221. As a direct and proximate result of Defendants' promissory fraud, Seel suffered substantial damages, including but not limited to loss of the secrecy and value of its confidential information, lost merchants and revenue, lost business opportunities, and investigative and mitigation costs, in an amount to be proven at trial.

222. Defendants' conduct was intentional, willful, malicious, and fraudulent, and carried out with conscious disregard of Seel's rights. Seel therefore seeks compensatory and consequential damages, punitive damages against Defendants, and such other and further relief as the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION

## (INTENTIONAL INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONSHIPS)

(Against All Defendants)

223. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

224. As alleged in detail above, Seel had valid, existing contractual relationships with multiple online merchants and partners pursuant to which those merchants integrated and offered Seel's post-purchase services and generated revenue for Seel.

225. As alleged above, Defendants knew of these existing contractual relationships. Defendants obtained this knowledge through their role as Seel's purported channel partner, through fraudulently obtained access to Seel's confidential merchant lists and business documentation, and through Defendants' targeting of Seel's existing merchants in their subsequent conduct.

226. As alleged in detail above, Defendants intentionally engaged in acts designed to induce breach or disruption of Seel's existing merchant contracts, including by (a) soliciting Seel's contracted merchants to switch to Defendants' competing service built using Seel's stolen confidential information/trade secrets, and (b) disseminating false and disparaging statements regarding the legality and validity of Seel's services to Seel's merchants as part of a coordinated smear campaign.

227. Defendants' conduct was independently wrongful and unlawful, including acts of fraud, trade secret misappropriation, trade libel, and unfair competition, and was not justified by any legitimate competitive purpose.

228. On information and belief, Defendants' intentional interference was among the factors that influenced one or more merchants to breach, terminate, suspend, or otherwise disrupt their contractual relationships with Seel, including by ceasing to route transactions through Seel or prematurely discontinuing Seel's services. Defendants' conduct was among the factors that contributed to the breaches and disruptions of Seel's contractual relationships, and materially interfered with the performance of those agreements.

229. As a result of Defendants' interference, Seel suffered damages, including lost contract revenues, loss of the value of merchant relationships, and costs incurred to mitigate the fallout from Defendants' conduct, in amounts to be proven at trial.

230. Defendants acted willfully, maliciously, and with intent to injure Seel as part of their broader fraudulent scheme. Seel therefore seeks punitive damages in addition to

compensatory damages and all other relief permitted by law.

## FOURTEENTH CAUSE OF ACTION

## (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

(Against All Defendants)

231. Plaintiff reasserts and incorporates herein by reference the allegations contained in the preceding paragraphs.

232. As alleged in detail above, Seel had existing economic relationships and prospective business expectancies with merchants, platforms, and partners that carried a reasonable probability of future economic benefit, including merchants in Seel's sales pipeline, anticipated expansions of existing merchant relationships, and developing channel and platform partnerships.

233. Defendants knew of these prospective economic relationships or reasonably should have known of them based on their fraudulently obtained access to Seel's confidential business information, merchant pipeline data, and knowledge of Seel's market activities and growth strategy.

234. As alleged in detail above, Defendants intentionally engaged in wrongful conduct designed to disrupt or divert these prospective economic relationships, including by launching a competing service built on stolen confidential information, soliciting merchants using misappropriated competitive intelligence, and spreading false and disparaging statements about Seel's legality and compliance to discourage merchants and partners from doing business with Seel.

235. Defendants' conduct was independently wrongful and unlawful, including acts of fraud, trade secret misappropriation, trade libel, and unfair competition, and exceeded the bounds of any lawful competition.

236. Defendants' conduct disrupted Seel's prospective economic relationships and prevented Seel from realizing expected business opportunities, including merchants declining to proceed with integrations, pausing or abandoning expansions, or choosing Defendants'

competing service instead of Seel's.

237. Defendants engaged in this conduct with knowledge that disruption of Seel's prospective economic advantage was substantially certain to occur, and with the intent to appropriate Seel's future opportunities for Defendants' own benefit.

238. Defendants' wrongful conduct was a substantial factor in causing Seel's loss of prospective economic advantages. But for Defendants' conduct, Seel would have realized additional business opportunities and profits.

239. As a result of Defendants' interference, Seel suffered damages, including lost profits and the value of lost prospective relationships, in amounts to be proven at trial.

240. Defendants acted willfully, maliciously, and fraudulently as part of a systematic scheme to appropriate and destroy Seel's business opportunities. Seel therefore seeks punitive damages, in addition to compensatory damages and all other relief available under law.

## PRAYER FOR RELIEF

A. For an award of compensatory damages in favor of Seel and against Defendants in an amount to be proven at trial;

B. For exemplary and punitive damages;

C. For prejudgment interest thereon at the maximum rate allowed by law;

D. For attorneys' fees incurred in this action, to the extent permitted by law;

E. For all costs (including expert witness fees) incurred in this action;

F. For all equitable remedies, including disgorgement, restitution and/or injunctive relief; and

G. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Seel hereby demands trial by jury of all issues properly triable thereby.

**LTL ATTORNEYS LLP**

DATED: February 13, 2026

By: */s/ Caleb H. Liang*
Caleb H. Liang
Heather F. Auyang
Kevin B. Kelly
*Attorneys for Plaintiff*
*SEEL INC.*