REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**LTL ATTORNEYS LLP**
Caleb H. Liang, SBN 261920
Heather F. Auyang, SBN 191776
Kevin B. Kelly, SBN 274145
300 S. Grand Ave., Suite 3950
Los Angeles, CA 90071
Tel: (213) 612-8907
caleb.liang@ltlattorneys.com
heather.auyang@ltlattorneys.com
kevin.kelly@ltlattorneys.com

Attorneys for Plaintiff
SEEL INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| SEEL INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>XCOTTON CO., a California corporation; XCOTTON INSURANCE SERVICES LLC, a California company; XIAOMIANHUA DIGITAL TECHNOLOGY (SHANGHAI) CO., LTD., a limited liability company organized under the laws of the People's Republic of China; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO.: 4:26-cv-01359-HSG<br><br>**[PUBLIC REDACTED VERSION]**<br><br>NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date: July 16, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2<br><br>Action Filed: February 13, 2026<br>Trial Date: Not Set |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ....- 1 -

MEMORANDUM OF POINTS AND AUTHORITIES ....- 2 -

I. INTRODUCTION ....- 2 -

*Statement of the Issues to Be Decided:* ....- 3 -

II. FACTUAL BACKGROUND....- 3 -

A. Seel's Protectable Assets ....- 3 -

1. Trade Secrets and Proprietary Business Model ....- 3 -

a. Customer List and Data ....- 3 -

b. Proprietary Product Platform and User Experience....- 4 -

c. Partner Compensation Frameworks....- 5 -

d. Comprehensive Operational Documentation....- 5 -

e. Economic Value and Reasonable Measures to Maintain Secrecy ....- 5 -

B. The Parties' Relationship and Defendants' Access to Confidential Information ....- 6 -

C. Defendants' Launch of a Competing Platform Using Seel's Stolen Information ....- 7 -

D. Discovery and Termination of the MSA....- 8 -

E. Defendants' Ongoing Misconduct ....- 9 -

1. Continued Use of Seel's Trade Secrets and Merchant Diversion....- 9 -

2. The Coordinated Defamation Campaign ....- 10 -

3. Fabrication of Evidence and False Regulatory Complaints....- 11 -

4. Post-Termination Refusal to Return or Destroy Confidential Materials ....- 11 -

F. Summary of Harm....- 11 -

G. Prior Litigation and Pursuit of Federal Relief....- 12 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

III. LEGAL STANDARD ....... - 12 -
IV. ARGUMENT ....... - 12 -
A. This Court May Exercise Personal Jurisdiction Over All Defendants and Effectively Enforce Injunctive Relief ....... - 12 -
B. Plaintiff Is Likely to Succeed on the Merits ....... - 14 -
1. Lanham Act Claim (15 U.S.C. § 1125(a)) ....... - 14 -
a. Product Disparagement and Trade Libel (§ 1125(a)(1)(B)) ....... - 14 -
b. Unfair Competition Under the Lanham Act ....... - 17 -
2. Trade Secret Misappropriation ....... - 17 -
3. Unfair Competition ....... - 19 -
4. Breach of Contract and Breach of Implied Covenant ....... - 20 -
C. Seel Is Likely to Suffer Irreparable Harm Absent Preliminary Relief ....... - 21 -
D. The Balance of Equities Tips in Seel's Favor ....... - 22 -
E. The Public Interest Favors an Injunction ....... - 23 -
V. SCOPE OF RELIEF AND BOND ....... - 23 -
A. Requested Preliminary Injunctive Relief ....... - 23 -
B. The Requested Relief Is Narrowly Tailored ....... - 24 -
C. The Bond Requirement Should Be Waived or, at a Minimum, Be Nominal ....... - 24 -
VI. CONCLUSION ....... - 25 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**TABLE OF AUTHORITIES**

## Cases

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 143 S. Ct. 2522, 216 L. Ed. 2d 1013 (2023) ... - 16 -

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ... - 12 -

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ... - 22 -

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) ... - 14 -, - 15 -

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ... - 13 -

*Calder v. Jones*, 465 U.S. 783 (1984) ... - 13 -

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ... - 19 -

*Coastal Abstract, Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) ... - 15 -

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015) ... - 15 -

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) ... - 17 -, - 18 -

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ... - 24 -

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) ... - 23 -

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ... - 18 -

*Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290 (1985) ... - 20 -

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005 (S.D.N.Y. 1994) ... - 15 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Molina Healthcare, Inc. v. Celgene Corp.*,
No. 21-cv-05483-JCS, 2022 WL 161894 (N.D. Cal. Jan. 18, 2022) .................................- 19 -

*Oakwood Labs, LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021).....................................................................................- 18 -

*Q-Co Indus., Inc. v. Hoffman*,
625 F. Supp. 608 (S.D.N.Y. 1985).............................................................................- 18 -

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991).....................................................................................- 21 -

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004).....................................................................................- 13 -

*SI Handling Sys., Inc. v. Heisley*,
753 F.2d 1244 (3d Cir. 1985).....................................................................................- 18 -

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997).....................................................................................- 14 -

*Triad Sys. Corp. v. Se. Express Co.*,
64 F.3d 1330 (9th Cir. 1995).....................................................................................- 23 -

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
793 F.2d 1034 (9th Cir. 1986).....................................................................................- 16 -

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
617 F. Supp. 2d 938 (N.D. Cal. 2007) .......................................................................- 18 -

*Waymo LLC v. Uber Techs., Inc.*,
No. C 17-00939 WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017).............................- 21 -

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................- 3 -, - 12 -

**Statutes**

15 U.S.C. § 1116(a) .............................................................................................- 23 -

15 U.S.C. § 1125................................................................................. - 14 -, - 16 -, - 17 -

15 U.S.C. § 1127.....................................................................................................- 17 -

18 U.S.C. §§ 1836.......................................................................................... - 17 -, - 23 -

18 U.S.C. § 1839.....................................................................................................- 18 -

Cal. Bus. & Prof. Code § 17200 ...............................................................................- 19 -

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 16, 2026, at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 2, 4th Floor, of the United States Courthouse, 1301 Clay Street, Oakland, California, before the Honorable Haywood S. Gilliam, Jr., Plaintiff Seel Inc. ("Seel") will and hereby does move, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction against Defendants Xcotton Co., Xcotton Insurance Services LLC, and Xiaomianhua Digital Technology (Shanghai) Co., Ltd.

Seel seeks to enjoin Defendants, and all persons in concert, from: (1) using or disclosing Seel's trade secrets and confidential information; (2) retaining Seel's proprietary materials, and to compel their return/destruction with a sworn certification of compliance; (3) making literally false statements regarding the legality or regulatory compliance of Seel's services in commercial advertising or promotion; and (4) soliciting Seel's customers through the use of Seel's confidential pricing, contract terms, service-level specifications, or client-specific intelligence. Seel further requests that any bond under Rule 65(c) be waived or set in a nominal amount.

This Motion is made on the grounds that Seel is likely to succeed on its claims under the Defend Trade Secrets Act, the Lanham Act, and California's Unfair Competition Law, and for breach of contract; that Seel faces irreparable harm; that the balance of equities tips sharply in Seel's favor; and that an injunction serves the public interest.

This Motion is based on the accompanying Memorandum of Points and Authorities; the Declarations of Yalu Chen, Mo Chen, Yue Jiang, David Cao, and Caleb Liang and the exhibits thereto; the [Proposed] Order; the pleadings and record; and argument at the hearing.

**LTL ATTORNEYS LLP**

DATED: May 29, 2026

By: *<u>/s/ Caleb H. Liang</u>*
Caleb H. Liang
Heather F. Auyang
Kevin B. Kelly
*Attorneys for Plaintiff*
*SEEL INC.*

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff Seel Inc. ("Seel" or "Plaintiff") moves for a preliminary injunction against Defendants Xcotton Co., Xcotton Insurance Services LLC ("Xcotton Insurance"), and Xiaomianhua Digital Technology (Shanghai) Co., Ltd. ("Xiaomianhua") ("Defendants").

Under the guise of a collaborative distribution partnership, Defendants fraudulently induced Seel to share its most valuable proprietary assets, including: its customer list and related data, proprietary product platform and user experience, channel partner compensation frameworks, and comprehensive operational documentation. Within months, Defendants launched their copycat Xcotton platform using Seel's stolen confidential information and trade secrets, systematically diverted Seel's merchant clients, and launched a coordinated smear campaign falsely accusing Seel of operating an illegal insurance business in China.

Seel satisfies all four requirements for preliminary injunctive relief. First, Seel is likely to succeed on the merits: Defendants' misappropriation of proprietary confidential information constitutes trade secret theft under the Defend Trade Secrets Act ("DTSA"); their campaign of false statements designed to destroy Seel's reputation in the marketplace establishes a Lanham Act violation; their conduct violates California's Unfair Competition Law ("UCL"); and their wholesale breach of the Master Services Agreement's ("MSA") confidentiality, use-restriction, and post-termination return obligations establishes breach of contract. Second, Seel faces irreparable harm: ongoing loss of trade secret value, consumer confusion, erosion of merchant relationships, and reputational damage from the defamation campaign. Third, the balance of equities favors Seel because Defendants have no legitimate interest in continuing to use misappropriated trade secrets, confidential information, or literally false commercial statements to compete. The requested injunction merely requires that any competing business be built on Defendants' own independently developed information and conducted without disparagement of Seel. Fourth, the public interest strongly supports enjoining this conduct.

Defendants have now exploited Seel's stolen proprietary development for over a year. Every day without relief, the damage compounds. Accordingly, Seel respectfully requests that

the Court grant this motion to halt the ongoing harm.

*__Statement of the Issues to Be Decided__*:

Whether Seel is entitled to a preliminary injunction under Rule 65 and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) based on whether Seel has shown: (1) likelihood of success on its DTSA, Lanham Act, UCL, and breach-of-contract claims; (2) likelihood of irreparable harm; (3) that the balance of equities tips in its favor; and (4) that an injunction serves the public interest, and, if so, whether the Rule 65(c) bond should be waived or set at a nominal amount.

## II. FACTUAL BACKGROUND

### A. Seel's Protectable Assets

#### 1. Trade Secrets and Proprietary Business Model

Seel is an artificial intelligence-driven technology company that operates a post-purchase service program for consumers who shop online through merchant websites. Declaration of Yalu Chen ("Yalu Decl."), ¶ 2. Seel markets its services under the federally registered "Worry-Free Purchase" and "Worry-Free Delivery" marks. Yalu Decl., ¶ 10, Exs. 1-2.

When a consumer makes a purchase, Seel provides post-purchase services, providing real-time tracking, 24/7 support, and refund/replacement options, including for lost, damaged, or delayed shipments, stolen packages, and at-will returns, through a proprietary model and artificial intelligence agents. Yalu Decl., ¶ 2. Seel's ability to offer these services profitably at scale rests on years of proprietary knowledge and confidential data that cannot be replicated without access to Seel's systems. Yalu Decl., ¶ 3; Declaration of Mo Chen ("Mo Decl."), ¶¶ 3, 9.

Seel has invested more than [redacted] over several years developing its technology platform, pricing intelligence systems, and confidential business methodologies. Yalu Decl., ¶ 3. The trade secrets at issue fall into four categories: customer list and data, proprietary product platform and user experience, partner compensation frameworks, and operational documentation.

a. __Customer List and Data__

Seel's customers are the e-commerce merchants who integrate post-purchase services into their online storefronts. Seel maintains intelligence on these merchant relationships through

an internal dashboard, tracking merchant identities, product offerings, order volumes, revenue performance, pricing data, and profitability metrics across Seel's entire network of merchants. Declaration of Yue Jiang ("Jiang Decl."), ¶¶ 4-6; Mo Decl., ¶ 2. Defendants were granted live, real-time access to this dashboard, which displayed Seel's entire commercial operation as it unfolded across more than 50 partners and merchants. Jiang Decl., ¶¶ 5-6. Through this access, Defendants had continuous visibility into which specific Seel products each merchant offered; real-time and historical order volumes; revenue performance by merchant-product combination; service request cancellation rates and patterns; covered gross merchandise value; Seel's growth trajectory and merchant acquisition velocity; real-time pricing changes and their immediate impact on conversion rates and revenue; and merchant-level performance metrics including service cost ratios, service request rates, and profitability. Jiang Decl., ¶ 5.

This was not a one-time data snapshot. The competitive value of dashboard access exceeds that of a static merchant list because it revealed Seel's strategy as it was executed in real time, showing which merchants Seel prioritized, successful pricing approaches, and markets being penetrated, giving Defendants complete visibility into Seel's strategic playbook. Yalu Decl., ¶ 24; Jiang Decl., ¶ 7; Mo Decl., ¶ 4. Although dashboard access terminated with the MSA, the intelligence Defendants extracted does not become stale with time. It continues to inform Defendants' solicitation of Seel's merchants and the calibration of competing offers to undercut Seel's account-specific terms. Yalu Decl., ¶¶ 24, 35, 37; Jiang Decl., ¶ 7.

b. <u>Proprietary Product Platform and User Experience</u>

Seel has invested significant resources in research and development to build a suite of product features and pricing intelligence systems that constitute the core of Seel's competitive advantage, including proprietary fraud detection, pricing intelligence, and machine learning systems developed over several years. Mo Decl., ¶¶ 8-9. These systems generate dynamic service pricing calibrated to merchant-specific and geographic factors. Mo Decl., ¶ 8. The system's demonstrated business impact confirms its independent economic value: fraud detection systems prevent more than [redacted] in annual losses, and pricing model interventions have reduced service cost ratios by [redacted] across major platforms. Mo Decl., ¶ 9.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Seel's proprietary product platform also extends beyond the pricing system to include additional components that Defendants also accessed and replicated: a merchant onboarding flow refined through hundreds of implementations, and a Shopify application with proprietary integration architecture that is not publicly documented. Mo Decl., ¶¶ 5-6. During the partnership, Defendants received access to each of these systems and documentation. Mo Decl., ¶ 11. That access gave Defendants knowledge of Seel's proprietary pricing methodology, system architecture, and product design, details that would otherwise require years of independent development to acquire. Mo Decl., ¶¶ 3, 8. Defendants used that knowledge to build a competing platform replicating Seel's product features, including its consumer-facing interface and checkout integration. Yalu Decl., ¶¶ 38-39, Exs. 9-10; Mo Decl., ¶ 12.

c. Partner Compensation Frameworks

Seel developed confidential compensation structures for the channel partners through whom it reaches online merchants. These frameworks include specific commission percentages tied to transaction volume, tiered incentive structures with defined performance thresholds and bonus triggers, payment terms, and clawback provisions, none of which are publicly disclosed. Mo Decl., ¶ 7; Yalu Decl., ¶ 8. Their disclosure to a competitor would allow that competitor to selectively match or undercut Seel's offers to the most valuable partners. Yalu Decl., ¶ 8.

d. Comprehensive Operational Documentation

Seel compiled extensive confidential operational documentation, including merchant onboarding workflows, service delivery procedures, customer service scripts, escalation protocols, service request processing rules, merchant pitch materials, and marketing playbooks, that are internal-only materials provided to Defendants solely for facilitating the distribution partnership. Yalu Decl., ¶ 7; Mo Decl., ¶ 11.

e. Economic Value and Reasonable Measures to Maintain Secrecy

Each category of trade secret derives independent economic value from not being generally known and from the difficulty competitors would face in independently developing comparable systems without access to Seel's data and methodologies, as detailed above and quantified through more than [redacted] in documented research and development investment.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Seel took reasonable measures to maintain the secrecy of each category, including restricting access on a need-to-know basis; requiring Defendants to execute the MSA, which contained strict confidentiality provisions designating all information as Seel's "sole property" and prohibiting unauthorized use or disclosure (MSA §§ 1.7, 8.1, 8.2(ii)); limiting dissemination of proprietary materials to controlled channels; maintaining access controls and password protections for internal systems; and providing access to pricing data and operational documentation only after contractual safeguards were in place. Yalu Decl., ¶¶ 6, 14; Mo Decl., ¶ 14. No category of confidential information described above was publicly available or ascertainable through legitimate means. Mo Decl., ¶ 14; Yalu Decl., ¶¶ 7-8.

**B. <u>The Parties' Relationship and Defendants' Access to Confidential Information</u>**

In late August 2023, Defendants, acting through Xuanfeng (aka Bruce) Chen, who at all relevant times served as an officer, agent, and/or controlling person of each Defendant entity, approached Seel with what they characterized as a strategic business collaboration. Yalu Decl., ¶¶ 11-12, 16-17. Chen represented that Defendants were uniquely positioned to help Seel expand to Mandarin-speaking merchants, falsely claimed partnerships with Shopify and TikTok Shop, and asserted the partnership could generate revenue exceeding $100 million. Yalu Decl., ¶ 12. Defendants never delivered on any of these representations. Yalu Decl., ¶ 15.

Based on Defendants' misrepresentations, on or about November 1, 2023, Seel and Xcotton Co. executed a written Master Services Agreement (the "MSA"). Yalu Decl., ¶ 13, Ex. 3. The MSA appointed Xcotton Co. as a distributor of Seel's post-purchase products to Mandarin-speaking merchants. Although only Xcotton Co. was a formal signatory, the other Defendants directed, controlled, and substantially participated in performance under the Agreement. Bruce Chen negotiated the MSA on behalf of all Defendants and, after execution, directed and controlled performance under the Agreement on behalf of each entity. Yalu Decl., ¶ 16. Each Defendant entity directly benefited from the MSA by gaining access to Seel's confidential information: Xcotton Insurance Services LLC received and utilized Seel's pricing model and merchant intelligence in connection with its product protection services; Xiaomianhua Digital Technology (Shanghai) Co., Ltd. received Seel's operational documentation for use in

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

developing the competing platform. Yalu Decl., ¶ 19; Mo Decl., ¶ 11. Xcotton Co. and Xcotton Insurance Services LLC both maintain active California registrations and operate from the same address in Daly City, California. Liang Decl., ¶ 5, Ex. 23. Xcotton Insurance additionally holds a California Department of Insurance registration. Liang Decl., ¶ 6, Ex. 24. All three entities share common ownership, management, and operational control through Bruce Chen and Koney Hoi, who hold overlapping officer positions across the enterprise. Chen signed the MSA as CEO of Xcotton Co., serves as a managing member of Xcotton Insurance, and is the legal representative and chairman of Xiaomianhua's parent company, Mianmiao. Yalu Decl., ¶¶ 17-18, Ex. 4. Hoi holds senior officer positions at Xcotton Co., is a co-managing member of Xcotton Insurance with Chen, and is a director of Mianmiao. Yalu Decl., ¶¶ 18, 21; Liang Decl., ¶ 5, Ex. 23.

In exchange for access, Defendants agreed to maintain confidentiality of all information as Seel's "sole property" (MSA §§ 1.7, 8.1, 8.2(ii)); use the Technology solely for integration into a combined product, not as a standalone offering (MSA §§ 2.1, 3.1); refrain from reverse engineering (MSA § 3.4); and conduct business to "reflect favorably" on Seel's reputation (MSA § 6.3). Yalu Decl., ¶ 13, Ex. 3.

Seel performed its obligations under the MSA, disclosing in good faith its proprietary information, including detailed pricing models, partnership structures, compensation programs, daily revenue data, and comprehensive operational documentation, through strategic calls, working sessions, and deal-by-deal merchant data. Yalu Decl., ¶¶ 22-23; Jiang Decl., ¶¶ 2-6.

### C. Defendants' Launch of a Competing Platform Using Seel's Stolen Information

By mid to late 2024, Defendants had surreptitiously built and launched their own competing platform, the "Xcotton" platform, offering post-purchase services that were functionally identical to Seel's. Yalu Decl., ¶ 26; Mo Decl., ¶ 12. The speed with which Defendants launched, within months of gaining access, is inconsistent with independent development of trade secrets Seel spent years building. Mo Decl., ¶¶ 3, 8.

Defendants calibrated their pricing to track Seel's merchant-specific charge rates while offering substantially higher commission rates to induce merchants to switch — a strategy that required knowledge of Seel's confidential, individually negotiated terms for each account. Mo

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Decl., ¶ 13; Yalu Decl., ¶¶ 34-35. Defendants also misappropriated Seel's channel partner compensation structures (Yalu Decl., ¶ 35) and replicated Seel's workflows, copying marketing content verbatim, at times even leaving Seel's own name embedded in their materials. Mo Decl., ¶ 12. Defendants' copying extended to Seel's federally registered marks; Defendants used the "Worry-Free Delivery" mark on the GTRacing merchant website (www.gtracing.com) to label their own competing post-purchase services. Yalu Decl., ¶ 39, Ex. 10. Defendants have also replicated each new product Seel introduces, for example, the delayed-delivery compensation program Seel first launched in November 2022, which Defendants subsequently copied with an identical product. Yalu Decl., ¶ 40.

Defendants' copying was so blatant that independent third parties immediately recognized it. In a March 17, 2025 private WeChat conversation between employees of a major e-commerce platform provider with no connection to this dispute, one employee described Xiaomianhua's product as "Just like Seel" and explained: "Xcotton was originally seel's agent. Xcotton isn't doing agency work anymore. It has started something similar and has been doing business independently." Yalu Decl., ¶ 41, Ex. 11.

Defendants also used Seel's confidential information to divert merchant relationships, using knowledge of Seel's pricing and terms to undercut Seel and secretly switch merchants to Defendants' service. To date, Defendants have diverted at least [redacted] merchants, including major accounts, resulting in revenue losses [redacted]. Yalu Decl., ¶¶ 33, 34, 36, 63.

**D. <u>Discovery and Termination of the MSA</u>**

In November 2024, Seel discovered that Defendants were offering a virtually identical post-purchase service. Yalu Decl., ¶ 27. On December 9, 2024, Seel's Head of Production, Yalu Chen, confronted Bruce Chen, identifying multiple merchant websites deploying Defendants' product with text "basically identical" to Seel's materials and user workflows that appeared to have been copied wholesale. Yalu Decl., ¶ 29, Ex. 7. Bruce Chen acknowledged the issue and stated the product would be taken down from the U.S. market, then falsely claimed it was limited to European merchants. *Id.* Seel placed test orders as U.S. consumers, confirming the service was readily accessible in Seel's core territory. Yalu Decl., ¶ 28, Exs. 5-6. In a subsequent exchange,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Yalu Chen identified at least five to six merchant storefronts and advised that Seel would treat Defendants as a direct competitor. Yalu Decl., ¶ 30. On December 31, 2024, Seel terminated the MSA. Defendants failed to cease use of Seel's confidential information and did not return or destroy proprietary materials as required. Yalu Decl., ¶ 31, Ex. 8.

**E. Defendants' Ongoing Misconduct**

**1. Continued Use of Seel's Trade Secrets and Merchant Diversion**

Even after the MSA was terminated, Defendants persisted in competing against Seel using its stolen business model, pricing model, merchant lists, and marketing strategies. Yalu Decl., ¶¶ 33-35, 38-40; Mo Decl., ¶¶ 12-13. In 2025, Defendants continued to approach Seel's existing merchant partners, including major accounts such as 17TRACK and Anker, to persuade them to switch, leveraging their knowledge of the precise pricing, terms, and service levels Seel had provided to each merchant. Yalu Decl., ¶ 37.

a. Xcotton's Circumvention of Seel's Exclusive Shopline Partnership

On March 25, 2025, Seel entered into a Partnership Agreement with Shopline, an e-commerce platform that allows businesses to build and manage online stores (similar to Shopify), granting Seel exclusive rights to integrate and distribute post-purchase protection products on Shopline's platform. Yalu Decl., ¶ 42, Ex. 12. Seel paid substantial consideration for this exclusivity. Yalu Decl., ¶ 42.

Rather than legitimately competing, Xcotton deliberately circumvented Seel's exclusive arrangement by bypassing Shopline's official application marketplace entirely and encouraging merchants to install Xcotton's competing product through "private application" installations — a method that allows a merchant to add an application directly to its store without review or approval from Shopline, and without Shopline's knowledge or consent. Yalu Decl., ¶ 43. By February 28, 2026, this tactic had produced 105 unauthorized Xcotton installations on the Shopline platform. Yalu Decl., ¶ 43, Ex. 13. Shopline itself confirmed these installations to Seel and indicated it had not authorized them. Id.

b. Xcotton's Violations of Seel's Shoplazza Partnership Restrictions

Xcotton employed identical tactics against Seel's partnership with Shoplazza, a similar e-

commerce platform. Despite a September 24, 2025 Partnership Agreement containing express Xcotton-specific restrictions Yalu Decl., ¶ 44, Ex. 14, Xcotton bypassed Shoplazza's platform controls through private application installations. Internal Shoplazza communications from October 22, 2025, less than one month after signing, confirm that Shoplazza had already lost control, with an employee acknowledging the installations were occurring through channels that "can't be obtained through normal channels." Yalu Decl., ¶ 45, Ex. 15.

**2. The Coordinated Defamation Campaign**

In May 2025, Defendants launched a smear campaign. Mo Decl., ¶ 15; Yalu Decl., ¶ 46. Emails were sent to Seel's merchant partners, purporting to be from neutral Mandarin-speaking merchants sharing an allegedly friendly warning, but were in fact orchestrated by Defendants. The emails accused Seel of conducting an illegal insurance business in China, claimed that Seel had compliance issues with Chinese authorities, and warned merchants that using Seel's products could be legally risky, even speculating that Seel's services contracts might be void or that merchants might face liability for partnering with Seel. Yalu Decl., ¶ 46.

Each of those statements is literally false. Yalu Decl., ¶ 49. Seel does not operate an insurance business in China. Any allegations regarding non-compliance with Chinese regulations have no basis. Seel's contracts are valid and enforceable. Yalu Decl., ¶¶ 49-51. Defendants knew these statements were false because they previously sold Seel's services without ever raising regulatory concerns. Yalu Decl., ¶ 50.

On May 14, 2025, one merchant received such an email from "aliang60@outlook.com" and forwarded it to Seel. Mo Decl., ¶ 17; Yalu Decl., ¶ 46, Ex. 16. This email caused the merchant to demand the immediate removal of all Seel integrations and references from its website and to state its intention to terminate its relationship with Seel. Yalu Decl., ¶ 56. Using digital forensic techniques, Seel traced the email to IP address 180.158.87.35, located at the exact street address where Xiaomianhua maintains its registered offices in Shanghai. Mo Decl., ¶ 18. On May 15, 2025, Seel's representatives confirmed the IP match through on-site investigation at Xiaomianhua's office. Mo Decl., ¶ 19, Ex. 25. Server logs revealed the same IP address had accessed Seel merchant partners' websites on May 7 and May 12, 2025,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

demonstrating systematic reconnaissance in advance of the campaign. Mo Decl., ¶ 20.

Defendants simultaneously disseminated materially identical false publications through various Chinese-language digital media channels. Yalu Decl., ¶¶ 47-48, Exs. 17-20; Mo Decl., ¶ 16. Seel's investigation traced the defamatory publications to entities connected, through common ownership in a multi-layered corporate structure (Shanghai Three Friends → Shanghai Lvbao → Mianmiao → Xiaomianhua), to Defendants. Mo Decl., ¶ 16. Direct evidence further establishes that Bruce Chen personally disseminated defamatory content and coordinated with business partners regarding the campaign. Yalu Decl., ¶¶ 53-55, Exs. 21-22.

The defamation campaign served Defendants' immediate commercial objectives. While disseminating these false accusations, Defendants simultaneously solicited Seel's existing merchant accounts, with Bruce Chen personally recruiting merchants and offering to "take over" their operations on Defendants' competing platform. Yalu Decl., ¶¶ 52-56. Multiple merchants forwarded the defamatory emails to Seel, demonstrating concrete and immediate impact on Seel's commercial relationships. Yalu Decl., ¶ 56.

**3. Fabrication of Evidence and False Regulatory Complaints**

Defendants further fabricated evidence and filed false regulatory complaints with Chinese authorities, including creation of a sham Shopify store, generation of a fake purchase order using a fictitious identity, and submission of fabricated material to the Shanghai Financial Regulatory Bureau designed to create the appearance that Seel was selling insurance to Chinese consumers without authorization. Yalu Decl., ¶¶ 57-58.

**4. Post-Termination Refusal to Return or Destroy Confidential Materials**

Despite Seel's termination of the MSA on December 31, 2024, Defendants have failed to return or destroy Seel's proprietary materials as required. Seel has received no certification of compliance, and Defendants' continued operation of a competing platform built on Seel's stolen information confirms they retain and use Seel's proprietary materials daily. This ongoing violation enables every other category of misconduct described above. Yalu Decl., ¶ 32.

**F. <u>Summary of Harm</u>**

Taken together, Defendants' ongoing misconduct has caused Seel to lose at least [redacted]

merchant customers, [redacted] in revenue, and sustained damage to its market position, brand identity, and reputation. Yalu Decl., ¶¶ 33, 63-64. This harm compounds daily as Defendants continue to operate their cloned platform and approach Seel's remaining merchants with stolen pricing intelligence. Yalu Decl., ¶¶ 37, 65.

### G. **<u>Prior Litigation and Pursuit of Federal Relief</u>**

Upon discovering Defendants' competing service in November 2024, Seel terminated the MSA in December 2024 and filed a state court action in February 2025 asserting breach of contract, unfair business practices, and unjust enrichment. Defendants escalated rather than desisted: the defamation campaign began in May 2025, fabrication of evidence followed, and copying and merchant solicitation continue to this day. The full scope of Xiaomianhua's role, including the IP trace, Chen's cross-entity coordination, and corporate connections to Shanghai Three Friends Technology, emerged through investigation conducted between May and November 2025, prompting Seel to retain new counsel in December 2025 to pursue comprehensive federal relief. Yalu Decl., ¶¶ 59-62; Mo Decl., ¶ 15; Liang Decl., ¶¶ 2-3.

## III. LEGAL STANDARD

A plaintiff seeking preliminary injunction must establish: (1) likelihood of success; (2) likelihood of irreparable harm in the absence of relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit also preserves the "sliding scale" approach, under which "serious questions going to the merits" and a balance of hardships that "tips sharply" toward the plaintiff can support preliminary relief when the other *Winter* factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## IV. ARGUMENT

### A. **<u>This Court May Exercise Personal Jurisdiction Over All Defendants and Effectively Enforce Injunctive Relief</u>**

As a threshold matter, this Court has personal jurisdiction over each Defendant. Xcotton Co. and Xcotton Insurance are California entities subject to general jurisdiction. Xiaomianhua is subject to specific jurisdiction under the Ninth Circuit's purposeful direction test.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (establishing three-prong specific jurisdiction test: (1) purposeful direction of activities toward the forum; (2) claims arising out of forum-related activities; and (3) reasonableness).

First, as set forth in Sections II.B–E, all three Defendant entities operate under the common ownership, management, and control of Bruce Chen and acted collectively throughout the scheme. Xiaomianhua's contacts satisfy the *Calder* "effects test" for purposeful direction. *Calder v. Jones*, 465 U.S. 783 (1984); *Schwarzenegger*, 374 F.3d at 803. Under *Calder*, purposeful direction is established where the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm the defendant knew was likely to be suffered in the forum. *Id.* Here, Xiaomianhua committed intentional acts by directing the defamation campaign, building a competing platform to serve U.S. merchants, and coordinating merchant diversion through Bruce Chen. Those acts were expressly aimed at the United States: the defamatory emails, traced by IP address to Xiaomianhua's offices (Section II.E.2), targeted U.S. merchants among Seel's primarily U.S. merchant base (Yalu Decl., ¶ 5); the competing platform was built to reach U.S. merchants through domestic platforms; and Xiaomianhua executed the scheme through the California-registered Xcotton entities. The resulting harm was felt in California, where Seel is headquartered. These contacts were not random or fortuitous but the product of a deliberate scheme executed through Xiaomianhua's California-based alter egos, establishing a forum connection independent of Seel's presence here. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

Second, each of Seel's claims arises directly from these forum-directed activities. The trade secret misappropriation claims arise from Defendants' acquisition and use of Seel's confidential information through the California-based partnership. The Lanham Act claims arise from the defamation campaign directed at Seel's U.S. merchant partners. The breach of contract claims arise from the MSA negotiated and performed through the California Xcotton entities.

Third, once the first two prongs are satisfied, the burden shifts to Defendants to present a compelling case that jurisdiction is unreasonable. *Schwarzenegger*, 374 F.3d at 802. Defendants cannot carry that burden here given the presence of domestic co-defendants, the forum's strong

interest in adjudicating intellectual property disputes involving a resident plaintiff, and the interstate judicial system's interest in efficient resolution.

The Court can also effectively enforce injunctive relief against Xiaomianhua through the domestic Xcotton entities (Section II.B).

### B. Plaintiff Is Likely to Succeed on the Merits

#### 1. Lanham Act Claim (15 U.S.C. § 1125(a))

Section 43(a) of the Lanham Act prohibits, among other things, false or misleading representations of fact that, "in commercial advertising or promotion, misrepresent[] the nature, characteristics, qualities, or geographic origin" of another person's goods or services. 15 U.S.C. § 1125(a)(1)(B). Defendants have violated this provision through a coordinated campaign of product disparagement and unfair competition.

a. Product Disparagement and Trade Libel (§ 1125(a)(1)(B))

To prevail on a false advertising claim, a plaintiff must show: (1) a false statement of fact in a commercial advertisement about its own or another's product; (2) actual deception or a tendency to deceive a substantial segment of the audience; (3) materiality, in that the deception is likely to influence purchasing decisions; (4) that the defendant caused the false statement to enter interstate commerce; and (5) injury or likely injury to the plaintiff. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Seel satisfies each element.

*i. Commercial Advertising or Promotion (Threshold Requirement)*

A threshold requirement of this claim is that the false statements were made in "commercial advertising or promotion." Here, Defendants disseminated "anonymous" emails and syndicated articles to Seel's merchant partners falsely accusing Seel of operating an illegal insurance business, having void contracts, exposing merchants to regulatory liability, and systematically denying service requests. Under the *Coastal Abstract* test adopted by the Ninth Circuit, a statement constitutes "commercial advertising or promotion" where it is (1) commercial speech, (2) made by a defendant in commercial competition with the plaintiff, (3) for the purpose of influencing consumers to buy the defendant's goods or services, and (4) disseminated sufficiently to the relevant purchasing public. *Ariix, LLC v. NutriSearch Corp.*, 985

F.3d 1107, 1115 (9th Cir. 2021). Defendants' communications satisfy each factor.

The first three factors are plainly met. Although the emails were disguised as regulatory warnings, their substance and context establish that they are commercial speech. The statements do not address matters of public regulatory concern in the abstract; they target a specific competitor's services and are designed to induce specific merchants to stop purchasing those services. A defendant cannot evade the Lanham Act by recasting commercial disparagement as disinterested regulatory advice; the framing is itself the competitive weapon. See *Ariix*, 985 F.3d at 1115 (biased product reviews actionable as commercial advertising).

The fourth factor, sufficient dissemination, does not require that false statements reach every potential purchaser. It requires dissemination to the relevant purchasing public within that industry. *Coastal Abstract*, 173 F.3d at 735. Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may suffice. *Id.* Here, Defendants did not broadcast indiscriminately to the e-commerce market at large. They directed their campaign at a specific, identifiable segment: Seel's existing cross-border merchant customers, the precise accounts Defendants sought to divert. Multiple merchants within this group received and forwarded the emails to Seel, confirming the emails reached their intended audience. Yalu Decl., ¶ 56.

Courts have held that even small numbers of targeted communications to a competitor's existing customers satisfy the dissemination requirement where the communications are designed to divert those customers. *See Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1020-1021 (S.D.N.Y. 1994) (single letter designed to halt purchase of competitor's product constituted commercial advertising); *cf. Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015) (email to 22 of plaintiff's existing clients sufficient under test measuring dissemination against plaintiff's customer base).

*ii. Falsity (Elements One and Two)*

Defendants made four categories of literally false statements of fact through emails and syndicated articles: that Seel operates an "illegal insurance business" in mainland China; that Seel's service contracts are "void" or "unenforceable"; that merchants partnering with Seel face

"regulatory liability" and potential legal sanctions; and that Seel systematically denies consumer service requests. Each statement is literally false, and Defendants published them knowingly, as part of a deliberate campaign disparaging a direct competitor to divert its customers. *See supra* Section II.E.2. Such deliberately false claims attacking a competitor's services give rise to a presumption of actual deception and reliance. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986).

*iii. Materiality and Injury (Elements Three and Five)*

The false statements were calculated to and did influence merchants' purchasing decisions. Multiple merchants forwarded the emails expressing concern, and Defendants diverted merchant accounts during the same period the campaign was running (Section II.E.2). The statements are material as a matter of law because they go to the fundamental legality and reliability of Seel's services.

*iv. Interstate Commerce (Element Four)*

Any argument that the defamation campaign falls outside the Lanham Act's reach because certain statements originated in China fails for three independent reasons.

First, the Supreme Court's decision in *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 143 S. Ct. 2522, 216 L. Ed. 2d 1013 (2023), does not control this claim. *Abitron* held that § 1125(a)(1) extends only to "domestic" uses in commerce and analyzed that requirement in the context of trademark infringement under subsection (A). *Id.* at 415–16. The majority never addressed a § 1125(a)(1)(B) false advertising claim, never analyzed dissemination of false statements as a distinct type of "use in commerce," and the words "false advertising" do not appear in the opinion. The question of how *Abitron's* domestic-use requirement applies to false advertising—where the relevant conduct is targeted dissemination of commercial statements rather than the sale of mislabeled goods—remains open.

Second, even if *Abitron*'s framework reaches this claim, the conduct satisfies it. Applying *Abitron*'s own method, the conduct relevant to § 1125(a)(1)(B) is the dissemination of the false statements, and that conduct was domestic: Defendants directed the statements to Seel's merchant clients, a base primarily located in the United States and other English-speaking

markets and serving consumers predominantly in the United States (Yalu Decl., ¶ 5), and U.S. merchants within that base received and acted on the statements in the United States. Yalu Decl. ¶¶ 46–47, 56. The dissemination was, moreover, the instrument of a domestic scheme: the same statements were deployed to solicit the same U.S. merchant accounts, and the foreign keystroke of an email cannot be severed from the domestic commercial conduct it carried out.

Third, the false advertising claim does not rest solely on the defamation campaign. Defendants also used Seel's federally registered marks on U.S.-facing merchant websites to label their own competing services (Section II.C; Yalu Decl., ¶¶ 38–39, Ex. 10), and replicated Seel's user interface to create a false impression of affiliation displayed to U.S. consumers. Yalu Decl., ¶ 38; Mo Decl., ¶ 12. These are domestic acts of commercial promotion—not foreign-origin statements with a downstream U.S. effect—and independently satisfy the "use in commerce" requirement regardless of where the defamation campaign originated.

b. Unfair Competition Under the Lanham Act

Beyond the specific false advertising violations above, Defendants' conduct as a whole constitutes unfair competition actionable under Section 43(a), one of whose express purposes is "to protect persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127. The integrated scheme established in the Factual Background, including fraudulent partnership, copycat platform, disparagement campaign, and solicitation using stolen intelligence, which was sustained through escalating violations after termination, makes injunctive relief especially warranted. *See* 15 U.S.C. § 1125(a).

**2. Trade Secret Misappropriation**

The DTSA creates a cause of action for the misappropriation of trade secrets related to a product or service used in commerce and authorizes injunctive relief to prevent actual or threatened misappropriation. To prevail on a DTSA claim, a plaintiff must show: (1) it possessed a trade secret, (2) the defendant misappropriated the trade secret, and (3) the misappropriation caused or threatened damage to the plaintiff. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see* 18 U.S.C. §§ 1836(b)(1), 1839(3), (5). Seel satisfies each element.

A trade secret is information that derives independent economic value from not being generally known or readily ascertainable, and that its owner has taken reasonable measures to keep secret. 18 U.S.C. § 1839(3). Seel's four categories of trade secrets, detailed in Sections II.A.1.a through II.A.1.d, consist of specific, non-public compilations, configurations, and methodologies meeting both requirements. The merchant lists and client-specific intelligence alone allowed Defendants to bypass years of market development and target the precise accounts most likely to convert, the hallmark of an actionable trade secret. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (customer lists and related data constitute protectable trade secrets where they provide a competitive advantage not otherwise available). As detailed in Section II.A.1.e, Seel took reasonable measures to maintain secrecy, including restricting access on a need-to-know basis, requiring contractual confidentiality protections through the MSA, and maintaining technical access controls for internal systems. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660–61 (9th Cir. 2020).

Defendants' conduct constitutes misappropriation under two theories. First, Defendants acquired Seel's trade secrets through improper means: the fraudulent scheme detailed in Section II.B, through which they obtained Seel's trade secrets by misrepresentation. Second, Defendants used Seel's trade secrets without consent to build and operate a competing platform. Either theory independently establishes misappropriation. Improper acquisition alone constitutes misappropriation, independent of any use. 18 U.S.C. § 1839(5)(A). Defendants' fraudulent inducement of the MSA (Section II.B) supplied the improper means, § 1839(6)(A), and their resulting access to Seel's live merchant dashboard and operational documentation is undisputed (Jiang Decl., ¶¶ 5-6, 8; Yalu Decl., ¶ 25). Because trade secret misappropriation "can rarely be proved by convincing direct evidence," circumstantial evidence is particularly appropriate in such cases. *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (quoting *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985)); *see also Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021) (recognizing that "[m]isappropriation and misuse [in trade secret actions] can rarely be proved by convincing direct evidence" (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985))).

The circumstantial evidence of use is overwhelming, and each piece ties to a specific identified trade secret rather than being offered as an undifferentiated whole. Defendants' verbatim copying of Seel's workflows and marketing content, at times bearing Seel's own name (Mo Decl., ¶ 12), is direct evidence of the use of Seel's operational documentation (Section II.A.1.d): content bearing Seel's name could not have been independently developed, and independent third parties immediately recognized the copying (Section II.C). Defendants' calibration of competing offers to Seel's individually negotiated, merchant-specific terms (Mo Decl., ¶ 13; Yalu Decl., ¶¶ 34-35, 37) reflects use of Seel's confidential merchant intelligence (Section II.A.1.a); their offer of higher commissions to induce Seel's channel partners to switch (Yalu Decl., ¶¶ 34-35) reflects use of Seel's confidential compensation frameworks (Section II.A.1.c); and their launch of a functionally identical platform months after access, at a fraction of Seel's development cost, corroborates use of Seel's pricing intelligence and non-public integration architecture (Section II.A.1.b; Cao Decl., ¶ 2; Mo Decl., ¶¶ 3-8).

The misappropriation is not historical, it is ongoing and escalating. Defendants continue to use the misappropriated trade secrets to operate their competing platform, recruit channel partners, and divert Seel's clients (Sections II.E.1, II.E.4). Absent injunctive relief, Defendants will retain the benefit of an unfair head start that damages alone cannot eliminate.

**3. Unfair Competition**

California's UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. Seel is likely to succeed on all three prongs.

First, Defendants' conduct violates the DTSA and the Lanham Act, satisfying the unlawful prong, which "'borrows' violations of other laws and treats them as unlawful practices" that are "independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

Second, the conduct independently satisfies the "unfair" prong. As between direct competitors, "unfair" conduct must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel-Tech*, 20 Cal. 4th at 186–87; *see Molina Healthcare, Inc. v. Celgene Corp.*, No. 21-cv-05483-JCS, 2022 WL 161894, at *8 (N.D. Cal.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Jan. 18, 2022). Both are met. Defendants' conduct is tethered to the legislatively declared policies of the DTSA and CUTSA against trade-secret misappropriation and of the Lanham Act against commercial disparagement. And it "significantly threatens or harms competition" by operating a competing platform built on Seel's misappropriated assets and diverting Seel's merchants through false statements, thereby harming the competitive process and rewarding misappropriation over innovation, an injury to competition itself, not merely to Seel.

Third, the conduct was designed to deceive Seel (Section II.B), merchants (Section II.C), and the broader marketplace (Section II.E.2), thereby satisfying the fraudulent prong.

#### 4. Breach of Contract and Breach of Implied Covenant

The MSA is a valid and enforceable contract (Section II.B), and Seel has performed its obligations (Section II.B). Defendants materially breached the MSA by: (a) using Seel's confidential information to develop a competing platform (MSA §§ 2.1, 3.1; Section II.C); (b) failing to maintain confidentiality (MSA §§ 8.1, 8.2(ii); Section II.E.1); (c) defrauding and defaming Seel rather than reflecting favorably on Seel's reputation (MSA § 6.3; Section II.E.2); and (d) failing to return proprietary materials post-termination (Section II.E.4).

Although Xcotton Co. was the sole MSA signatory, the non-signatory Defendants are bound under alter ego principles. Under California law, alter ego liability requires (1) a unity of interest and ownership such that the separate personalities of the entities no longer exist, and (2) adherence to the fiction of separate existence would sanction fraud or promote injustice. *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985). Both elements are met. Bruce Chen and Koney Hoi exercise overlapping management authority across all three entities, Chen negotiated and directed the MSA on behalf of all Defendants, and Seel's proprietary information flowed freely among all three without corporate formality (Section II.B). Allowing Xcotton Insurance and Xiaomianhua to disclaim the MSA's obligations while retaining the benefits of the trade secrets obtained through it would sanction the precise fraud the alter ego doctrine exists to prevent.

Injunctive relief is necessary. The MSA contains specific restrictive covenants governing the use, disclosure, and return of confidential information, which are precisely the type of negative covenants that equity has long enforced by injunction because damages are inherently

inadequate. Once confidential information is used to build a competing business, no monetary damages can restore it to its confidential state. *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (holding injunctive relief appropriate to enforce restrictive covenants where breach causes ongoing harm not remediable by damages alone). Defendants' ongoing breach is a continuing violation that deepens each day Defendants operate using Seel's confidential information (Sections II.E.1, II.E.4).

Defendants also breached the implied covenant of good faith and fair dealing. The express contract claim addresses Defendants' violations of specific MSA provisions. The implied covenant claim addresses distinct conduct: Defendants' systematic exploitation of the ongoing contractual relationship to extract competitive intelligence while concealing their competing platform. While secretly operating a competing platform built on Seel's information (Section II.C), Defendants continued to take strategic calls, access Seel's live merchant dashboard, and allow the MSA to auto-renew in October 2024, all without disclosing the competing business. No express MSA provision required Defendants to disclose their competitive plans. But the implied covenant required Defendants not to exploit the trust and access inherent in the contractual relationship to further objectives adverse to Seel's interests. By accepting Seel's proprietary information under the guise of a partnership they had already repudiated in substance, Defendants frustrated Seel's right to the benefits of the agreement.

### C. <u>Seel Is Likely to Suffer Irreparable Harm Absent Preliminary Relief</u>

Seel faces three categories of likely irreparable harm.

First, Seel faces irreparable loss of trade secret value. Every day that Defendants continue operating using Seel's stolen trade secrets, the value erodes. Courts have recognized that ongoing loss of trade secret value constitutes irreparable harm. *See*, *e.g.*, *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (granting preliminary injunction in part where misappropriator's continued possession of trade secrets posed harm that "cannot be unwound after the fact"). These damages are inherently difficult to quantify because trade secret value, once disseminated, cannot be recaptured, and the competitive head start Seel built through years of development cannot be reduced to a dollar

figure.

Second, Seel faces irreparable harm from the ongoing erosion of its merchant and partner relationships. As detailed in Sections II.C, II.E.1, and II.G, Defendants have diverted at least [redacted] merchants using stolen intelligence. These relationships, cultivated over years of investment within a close-knit market, cannot be reduced to a dollar figure. Seel has already spent more than [redacted] on corrective information sessions and workshops to counteract the false statements. Yalu Decl., ¶ 63. At least [redacted] prospective merchant relationships have stalled or failed as a direct result of the campaign. Yalu Decl., ¶ 64.

Third, Seel faces irreparable harm from Defendants' coordinated defamation campaign. As detailed in Sections II.E.2-E.3, Defendants are actively poisoning Seel's reputation through literally false statements and fabricated regulatory evidence. Reputational harm of this nature is inherently irreparable because once false statements take root in the minds of current and prospective business partners, no amount of monetary compensation can fully undo the damage. The campaign is ongoing, and multiple merchants have expressed concern (Section II.E.2), demonstrating concrete and immediate impact on Seel's commercial relationships.

Seel's timeline confirms diligence, not delay. As detailed in Section II.G, Seel acted continuously — terminating the MSA, suing in state court, and retaining federal counsel as the May 2025 defamation campaign and Xiaomianhua's role emerged through investigation. Yalu Decl., ¶¶ 59-62. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014) ("tardiness is not particularly probative in the context of ongoing, worsening injuries").

### D. <u>The Balance of Equities Tips in Seel's Favor</u>

As established in Sections II.A–G, Seel invested years and millions of dollars to develop a proprietary business model, has had that model stolen through an elaborate fraud scheme, is losing merchants and revenue to a copycat operation, and faces ongoing reputational harm from a coordinated defamation campaign. Defendants' entire competing business was built on misappropriation, and they have no legitimate interest in continuing to operate it using this misappropriated information. Defendants have circumvented every non-judicial remedy Seel has pursued — continuing to operate after termination of the MSA, escalating to a defamation

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

campaign after Seel sued, and bypassing the Shopline and Shoplazza platforms through unauthorized private-app installations despite Xcotton-specific contractual restrictions. Only judicial intervention will halt the misconduct. An injunction would not deprive Defendants of anything they lawfully created; it would simply prevent them from continuing to profit from wrongful conduct. *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration" (cleaned up)), *superseded by statute on other grounds*.

### E. The Public Interest Favors an Injunction

The public interest strongly supports injunctive relief. There is a powerful public interest in the protection of trade secrets and intellectual property rights, as well as in preventing consumer confusion, promoting fair competition, and deterring fraud in the marketplace. Denying relief would signal that businesses can profit from schemes to steal competitors' proprietary information, an outcome contrary to the public interest. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481–82 (1974) (identifying "the maintenance of standards of commercial ethics and the encouragement of invention" as the public policies underlying trade secret protection); *see also* 18 U.S.C. § 1836(b)(3)(A)(i); 15 U.S.C. § 1116(a).

## V. SCOPE OF RELIEF AND BOND

### A. Requested Preliminary Injunctive Relief

Seel requests that the Court order Defendants, their officers, agents, employees, and all persons acting in concert, to:

1. Cease using, disclosing, or relying upon any of Seel's trade secrets and confidential information, including but not limited to Seel's pricing model, service-cost modeling methodologies, partner compensation structures, operational documentation, and merchant lists;
2. Return or destroy all copies of Seel's confidential information and proprietary materials in Defendants' possession, custody, or control, and provide a sworn certification of compliance;

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

3. Cease making literally false statements of fact regarding the legality or regulatory compliance of Seel's services in commercial advertising or promotion directed to actual or prospective merchant clients for the purpose of influencing their purchasing decisions;
4. Cease soliciting or diverting Seel's customers where such solicitation is conducted using or relying upon Seel's confidential pricing data, contract terms, service-level specifications, or client-specific intelligence obtained through the MSA or Defendants' access to Seel's systems, including but not limited to approaching merchants with offers calibrated to Seel's specific pricing tiers or contractual terms for those merchants. This provision does not prohibit Defendants from soliciting merchants through lawful, independent competitive efforts that do not rely on Seel's confidential information.

### B. The Requested Relief Is Narrowly Tailored

The requested injunction is narrowly tailored. It does not prohibit Defendants from operating a post-purchase services business; it merely requires that any such business be built on Defendants' own independently developed information. The need for judicial enforcement is underscored by Defendants' demonstrated willingness to circumvent every contractual and commercial barrier Seel has erected, including platform-level exclusivity agreements negotiated specifically to address Defendants' conduct (Sections II.E.1.a–b).

### C. The Bond Requirement Should Be Waived or, at a Minimum, Be Nominal

Under Rule 65(c), the Court has wide discretion in setting a bond and may waive the requirement entirely where there is no realistic likelihood of harm to the enjoined party. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). A waiver or nominal bond is appropriate because the injunction imposes no cognizable costs on Defendants; it merely requires that they compete using their own independently developed information, and revenue lost from an unlawful enterprise does not constitute cognizable damages for purposes of Rule 65(c). The strength of Seel's case further reduces the likelihood Defendants will be found to have been wrongfully enjoined. Accordingly, Seel respectfully requests that the Court waive the bond

requirement or, alternatively, set the bond at a nominal amount that the Court deems appropriate.

## VI. CONCLUSION

Every requirement for preliminary relief is overwhelmingly satisfied, and even if the Court finds any element less than fully established, the serious questions going to the merits and the sharp tipping of hardships in Seel's favor independently support relief under the sliding scale approach, and Seel respectfully requests that the Court enter a preliminary injunction.

**LTL ATTORNEYS LLP**

DATED: May 29, 2026

By: *<u>/s/ Caleb H. Liang</u>*
Caleb H. Liang
Heather F. Auyang
Kevin B. Kelly
*Attorneys for Plaintiff*
*SEEL INC.*